**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHELLY J. IOANE,
*Plaintiff-Appellee*,

v.

JEFF HODGES; MICHELLE CASAREZ,
Federal Officer; BRIAN APPLEGATE,
Federal Officer; KENT SPJUTE,
Federal Officer,
*Defendants*,

and

JEAN NOLL,
*Defendant-Appellant*.

No. 16-16089

D.C. No.
1:07-cv-00620-
AWI-EPG

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted April 13, 2018
Pasadena, California

Filed September 10, 2018
Amended September 19, 2019

Before:  Carlos T. Bea and Mary H. Murguia, Circuit
Judges, and Donald W. Molloy,[*] District Judge.

Order;
Opinion by Judge Murguia;
Partial Concurrence and Partial Dissent by Judge Bea

## SUMMARY[**]

### *Bivens*

The panel amended the opinion and concurrence filed on
September 10, 2018, and affirmed the district court's order
denying Internal Revenue Service Agent Jean Noll's motion
for summary judgment based on her alleged qualified
immunity in a *Bivens v. Six Unknown Named Agents of Fed.
Bureau of Narcotics*, 403 U.S. 388 (1971), suit alleging that
Agent Noll violated plaintiff's Fourth Amendment right to
bodily privacy during the lawful execution of a search
warrant at plaintiff's home in 2006.

The panel first held that plaintiff could proceed with her
*Bivens* suit against Agent Noll.  Applying the test in *Ziglar
v. Abbasi*, 137 S. Ct. 1843 (2017), the panel held that this
case was similar to *Bivens* and therefore did not present a
"new context" where plaintiff's claim was that a federal

---

[*] The Honorable Donald W. Molloy, United States District Judge
for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

agent conducted a warrantless search of her person in violation of her Fourth Amendment right to bodily privacy.

The panel turned to the issue of qualified immunity and its first prong of reasonableness.  The panel held that the scope of the intrusion into plaintiff's bodily privacy here was significant, and weighed in favor of a determination of unreasonableness.  In addition, the manner of Agent Noll's intrusion weighed in favor of concluding that the intrusion was unreasonable.  Further, the panel held that none of the justifications Agent Noll offered for initiating the search were borne out by the facts.  The panel affirmed the district court on this issue.

The second part of the qualified immunity test required a determination whether, at the time of Agent Noll's actions in June 2006, the law was clearly established.  The panel held that by 2006, much of the Circuit's precedent regarding the right to bodily privacy had been established. The panel held that a reasonable officer in  Agent Noll's position would have known that such a significant intrusion into bodily privacy, in the absence of legitimate government justification, was unlawful.  The panel concluded that the unlawfulness of Agent Noll's conduct was beyond debate, and Agent Noll was not entitled to qualified immunity.

Judge Bea concurred in part and concurred in the judgment.  Judge Bea agreed with the majority that the case did not extend *Bivens* to a new context, and that the district court did not err in denying Agent Noll's motion for summary judgment regarding plaintiff's claim that Agent Noll violated plaintiff's clearly established constitutional rights.  Judge Bea would hold that Agent Noll's actions violated plaintiff's Fourth Amendment rights as clearly established in *Ybarra v. Illinois*, 444 U.S. 85 (1979).  Judge

Bea disagreed with the majority's holding that Agent Noll's actions violated plaintiff's clearly established right to bodily privacy.

## COUNSEL

Gretchen M. Wolfinger (argued), Jonathan S. Cohen, and Gilbert S. Rothenberg, Attorneys; Caroline D. Ciraolo, Principal Deputy Assistant Attorney General; Diana L. Erbsen, Deputy Assistant Attorney General; Tax Division/Appellate Section, United States Department of Justice, Washington, D.C.; for Defendant-Appellant.

Ariel Beverly (argued) and Norvik Azarian (argued), Certified Law Students; Paula M. Mitchell, Supervisor, Loyola Law School; E. Martin Estrada, Munger Tolles & Olson LLP, Los Angeles, California; for Plaintiff-Appellee.

**ORDER**

The opinion and concurrence filed on September 10, 2018, and appearing at 903 F.3d 929, is hereby amended. An amended opinion and concurrence is filed herewith.

The parties are hereby granted leave to file a petition for rehearing and/or suggestion for rehearing en banc, pursuant to FRAP 40 and G.O. 5.3(a).

---

**OPINION**

MURGUIA, Circuit Judge:

Plaintiff Shelly Ioane filed a *Bivens* suit against Internal Revenue Service ("IRS") Agent Jean Noll. Shelly alleged that Agent Noll violated her Fourth Amendment right to bodily privacy when, during the lawful execution of a search warrant at her home, Agent Noll escorted Shelly to the bathroom and monitored Shelly while she relieved herself. Agent Noll moved for summary judgment, claiming that she was entitled to qualified immunity. The district court denied Agent Noll's motion, and she appeals.[1]

---

[1] At summary judgment, plaintiffs included Shelly and her husband, Michael Ioane, Sr. Plaintiffs initially pursued several causes of action against the United States and the Federal agents who executed the search warrant on the Ioane residence. However, the only claims remaining at the summary judgment stage were for excessive force and invasion of bodily privacy in violation of their Fourth Amendment rights. The Ioanes claimed that the Federal agents, including Agent Noll, used excessive force when the Federal agents pointed guns at the Ioanes' heads, and that Agent Noll invaded Shelly's bodily privacy when Agent Noll entered the bathroom with Shelly and monitored Shelly while she relieved herself.

We have jurisdiction over this interlocutory appeal, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), and we affirm.

## Background

In 2006, Michael Ioane, Sr. ("Michael") was under investigation for criminal tax fraud and conspiracy. At the time, Agent Noll was a Supervisory Special Agent for the IRS Criminal Investigation Division, and she was asked to assist in executing a search warrant as part of the investigation regarding Michael. Prior to executing the search warrant, agents learned that the Ioanes had registered weapons and that these weapons likely would be at their home. The search warrant authorized the IRS agents to search the Ioane residence for, among other things, records, computers, computer-related equipment, and computer storage devices.

On June 8, 2006, agents from the IRS Criminal Investigation Division, including Agent Noll, arrived at the Ioane residence to conduct the search. Only Michael and Shelly were home at the time. The IRS agents informed Michael and Shelly that they could stay on the premises if they cooperated with the agents conducting the search. However, the agents informed the Ioanes that if they chose to leave the premises, they would not be allowed to return. Both Ioanes stayed on the premises, and sat in the kitchen while the agents conducted the search.

---

The district court granted summary judgment for Agent Noll on plaintiffs' excessive force claim, but denied Agent Noll summary judgment on Shelly's invasion of bodily privacy claim.

At some point early in the search, Michael needed to use the bathroom. A male agent escorted Michael to the bathroom and conducted a quick search of the bathroom area—opening a couple of drawers and looking in the shower—before exiting and closing the door behind him. The male officer stood outside the closed bathroom door while Michael relieved himself.

Then, about a half an hour into the search, Shelly told the agents that she needed to use the bathroom. Agent Noll escorted Shelly to the bathroom, and when she stepped inside and started to close the door, Agent Noll told Shelly that she had to come inside, too. Shelly asked Agent Noll to wait outside, but Agent Noll resisted her plea. Agent Noll told Shelly to remove her clothing so that she could make sure Shelly did not have anything hidden on her person. When Shelly objected, Agent Noll explained that she needed to make sure Shelly did not hide or destroy anything, and that this was standard procedure. Shelly, who was wearing a long sundress, pulled up her dress so Agent Noll could see that she was not hiding anything. According to Shelly, Agent Noll made Shelly hold up her dress while she relieved herself, using one hand to hold up her dress and the other to pull her underwear down. Agent Noll faced Shelly while Shelly used the bathroom, and when Shelly was finished, Agent Noll escorted her back to the kitchen.

## Analysis

On appeal, Agent Noll claims that the district court erred when it determined that she is not entitled to qualified immunity from Shelly's invasion of bodily privacy claim. Agent Noll contends that her actions were objectively reasonable, and therefore did not violate Shelly's Fourth Amendment rights. Further, Agent Noll argues that even if her actions were not reasonable, the law was not so clearly

established in 2006 that a reasonable officer in her position would have known that her actions were unlawful.

We review a district court's legal conclusion that an official is not entitled to qualified immunity de novo. *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009) ("Our interlocutory jurisdiction to review a denial of qualified immunity is limited exclusively to questions of law, which we review de novo.").

Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To balance these competing interests, we perform a two-part test. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Crowe v. Cty. of San Diego*, 608 F.3d 406, 427 (9th Cir. 2010). An officer is entitled to qualified immunity under this test unless (1) the facts, construed in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right, and (2) the right was clearly established at the time of the asserted violation. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012); *Saucier*, 533 U.S. at 201. If there is no constitutional violation, the inquiry ends and the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. On the other hand, if we determine that the alleged facts establish a constitutional violation, we proceed to part two of the test to determine whether the right at issue was clearly established. *Id*. While we have discretion to begin our analysis with either part of the test, *Pearson*, 555 U.S. at 236, it is nevertheless beneficial to begin with the first part of the test because it "promotes the development of constitutional precedent and is especially valuable with respect to

questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Pearson*, 555 U.S. at 236).

### 1. *Bivens* Claim

Before reaching the issue of qualified immunity, the first question we must address is whether Shelly may bring a *Bivens* suit against Agent Noll. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (whether *Bivens* applies "is 'antecedent' to the other questions presented") (quoting *Wood v. Moss*, 572 U.S. 744, 757 (2014)).

In 1971, the Supreme Court recognized for the first time an implied right of action against federal officers for constitutional violations. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Court held that plaintiff Webster Bivens was entitled to sue federal agents for damages arising out of an unlawful arrest and search, in violation of his Fourth Amendment rights. *Id.* at 389–90.

Following *Bivens*, however, the Supreme Court has repeatedly refused to recognize an implied damages remedy against federal officials. *See Rodriguez v. Swartz*, 899 F.3d 719, 737 (9th Cir. 2018) (collecting cases). Recently, the Court "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). "This [trend] is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'" *Id.* (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

In *Abbasi*, the Supreme Court laid out a two-step test for determining when a *Bivens* claim should be recognized. "[T]he first question a court must ask . . . is whether the claim arises in a new *Bivens* context[.]" *Id.* at 1864. A case presents a new context if it "is different in a meaningful way from previous *Bivens* cases decided by th[e Supreme Court]." *Id*. *Abbasi* outlined the following non-exhaustive "list of differences that are meaningful enough to make a given context a new one":

> A case might differ in a meaningful way because of [1] the rank of the officers involved; [2] the constitutional right at issue; [3] the generality or specificity of the official action; [4] the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [5] the statutory or other legal mandate under which the officer was operating; [6] the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or [7] the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60.

If the case presents a new *Bivens* context, then the court proceeds to step two. At step two, a court may extend *Bivens* in a new context only if two conditions are met. First, "the plaintiff must not have any other adequate alternative remedy." *Rodriguez*, 899 F.3d at 738. Second, "there cannot be any 'special factors' that lead [the court] to believe that Congress, instead of the courts, should be the one to authorize a suit for money damages." *Id.* While the Supreme Court has yet to define the term, "special factors," it has

explained that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58. Therefore, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858.

Here, a review of the *Abbasi* factors in the first step of the *Bivens* analysis demonstrates that this case is similar to *Bivens* and therefore does not present a "new context." Both cases concern an individual's Fourth Amendment right to be free from unreasonable searches and seizures. In *Bivens*, federal agents allegedly searched Bivens's home and his person (by subjecting him to a visual strip search), without probable cause or a warrant. *See* 403 U.S. at 389. Likewise, Shelly's claim here is that a federal agent conducted a warrantless search of her person in violation of her Fourth Amendment right to bodily privacy.

There is no difference between the two cases with respect to the rank of the officers involved, the generality or specificity of the official action at issue, or the legal mandate under which the officers were operating.[2] Further, the extent of judicial guidance as to how Agent Noll should have responded to the problem was well established.[3]

---

[2] The fact that Agent Noll searched the Ioane residence pursuant to a lawful search warrant, unlike in *Bivens* where the agents were wholly without any warrant, is of no significance. The only Fourth Amendment claim at issue here is Shelly's. With respect to Shelly, Agent Noll conducted a warrantless search of her person.

[3] This *Abbasi* factor—"the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted," *Abbasi*, 137 S. Ct. at 1860—is analogous to the question in a qualified

Recognizing a *Bivens* action in this closely analogous case also does not result in any intrusion by the judiciary into the functioning of other branches. *See Bivens*, 403 U.S. at 407 (Harlan, J., concurring) ("[T]he judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment."). Nor does this case implicate any special factors not considered previously that counsel against recognizing a *Bivens* remedy.

Rather, as was the case in *Bivens*, there is no alternative remedy for a person in Shelly's position—"it is damages or nothing." *Id.* at 410 (Harlan, J., concurring); *cf. Abbasi*, 137 S. Ct. at 1865 ("[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action."). Accordingly, Shelly may proceed with her *Bivens* suit against Agent Noll.[4]

## 2.  Reasonableness

We now turn to the issue of qualified immunity and begin with its first prong. While the Ninth Circuit never has articulated a standard for when an officer's intentional

_____

immunity analysis of whether the law was "clearly established" at the time of the officer's actions such that a "reasonable official would understand that what [she] is doing violates" a person's constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While Judge Bea disagrees with the majority that Shelly's right to bodily privacy from a same-sex strip search was clearly established at the time (as explained in his separate concurrence), we all agree at a minimum that Shelly's right to be free from an unreasonable search was clearly established under *Ybarra v. Illinois*, 444 U.S. 85 (1979).

[4] Because we conclude that Shelly's *Bivens* claim does not present a "new context," we need not consider the second part of the *Bivens* analysis.

viewing of an individual's naked body is constitutionally permissible under the Fourth Amendment, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). Determining the reasonableness of a particular search involves balancing the degree to which the search intrudes upon an individual's privacy against the degree to which the search is needed to further legitimate governmental interests. *United States v. Knights*, 534 U.S. 112, 118–19 (2001). The required factors to consider are: "(1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (internal quotation marks omitted)).

Three cases from our Circuit inform the scope and manner of the intrusion here. We first recognized the right to bodily privacy in 1963. In *York v. Story*, we held that a plaintiff had alleged sufficient facts to state an invasion of bodily privacy claim under § 1983 when she alleged that three police officers took and distributed nude photos of her when she came to the station to report that she had been assaulted. 324 F.2d 450, 452, 455–56 (9th Cir. 1963). According to the allegations in the complaint, the officers had insisted that it was necessary to take photos of the plaintiff for her case, and directed her to undress in a room of the police station despite the plaintiff's objections and insistence that she did not have bruises that required her to be photographed in the nude. *Id.* at 452. Recognizing that the "naked body" is the most "basic subject of privacy," we concluded that the woman had alleged a claim that the officers' actions violated her privacy rights under the Fourteenth Amendment due process clause. *Id.* at 455–56.

In 1985, we recognized that the right to bodily privacy also applies to inmates. In *Grummett v. Rushen*, male prison inmates filed a class action § 1983 lawsuit alleging that the prison's practice of allowing female correction officers to view male inmates showering, disrobing, and using toilet facilities violated their privacy rights. 779 F.2d 491, 492–93 (9th Cir. 1985). Although we held that the prisoners had a right to privacy in their naked body, *id.* at 494, we concluded that the officials had not violated the inmates' privacy rights because the officials' view of the inmates was "restricted by distance," "casual in nature," and justified by security needs, *id.* at 495–96. We concluded that the prison authorities had "devised the least intrusive means to serve the state's interests in prison security" and had not violated the inmates' rights to bodily privacy. *Id.* at 494 (citing *Wooley v. Maynard*, 430 U.S. 705, 716 (1976)).

Finally, in 1992, we held that a parole officer violated a female parolee's right to bodily privacy when he entered the bathroom stall while the parolee was providing a urine sample. *Sepulveda v. Ramirez*, 967 F.2d 1413, 1415–16 (9th Cir. 1992). Distinguishing the facts in *Grummett*, we determined that the parole officer's view of the parolee was "neither obscured nor distant," and "far more degrading to [the parolee] than the situation faced by the inmates in *Grummett*." *Id.* at 1416. Relying on *Grummett* and recognizing that parolee rights are "even more extensive than those of inmates," we concluded that the parole officer had violated the parolee's bodily privacy rights. *Id.* at 1416.

From *York*, *Grummett*, and *Sepulveda*, we conclude that the scope of the intrusion into Shelly's bodily privacy here was significant. Agent Noll intruded on Shelly's most basic subject of privacy, her naked body. *See York*, 324 F.2d at 455. Moreover, unlike the prison inmates in *Grummett* and

the parolee in *Sepulveda*, Shelly's privacy interests had not been reduced. Just as in *Sepulveda*, where we recognized that parolees have, "at a minimum, the same right to bodily privacy as a prison inmate," 967 F.2d at 1416, Shelly, who had not been detained and was not herself the subject of a search warrant, had more right to bodily privacy than a parolee. *See Samson v. California*, 547 U.S. 843, 850 (2006) (explaining that parolees are on the "continuum" of state-imposed punishments with fewer expectations of privacy than probationers because parole is more akin to imprisonment). Therefore, the scope of Agent Noll's intrusion into Shelly's bodily privacy right was significant and weighs in favor of a determination of unreasonableness.[5]

---

[5] Although *York*, *Grummett*, and *Sepulveda* all involved searches by members of the opposite sex, gender was not central to the conclusion of whether the intrusion at issue was unreasonable. Indeed, *York*, *Grummett*, and *Sepulveda* recognize that the naked body is the most basic subject of privacy, and an arbitrary intrusion by any government actor is unconstitutional. *See York*, 324 F.2d at 455 ("The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."); *see also Grummett*, 779 F.2d at 495 (finding no violation even where prison search conducted by member of the opposite sex); *Sepulveda*, 967 F.2d at 1416 (emphasizing the up-close, unobscured privacy intrusion rather than the fact that the parole officer and parolee were of opposite genders); *Byrd*, 629 F.3d at 1150 (N.R. Smith, J., dissenting in part) ("In evaluating the scope of a search, the searching officer's gender is irrelevant."). The concurrence takes a different view regarding these cases, but it appears from these cases that gender is a factor for evaluating the severity of the intrusion rather than the mark of the intrusion itself. Indeed, as with any Fourth Amendment analysis, the question is balancing the nature of the intrusion against the degree to which the search is needed to further legitimate governmental interests. *Knights*, 534 U.S. at 118–19. That Agent Noll and Shelly both are

Additionally, unlike the casual, obscured, and restricted manner of observation by the prison officials in *Grummett*, Agent Noll stood facing Shelly in the Ioanes' home bathroom while Shelly relieved herself. Agent Noll's intrusion was like the parole officer's intrusion in *Sepulveda*, which we concluded was unreasonable.[6] *See Sepulveda*, 967 F.2d at 1415–16; *see also York* 324 F.2d at 455. Therefore, the manner of Agent Noll's intrusion weighs in favor of concluding that the intrusion was unreasonable. *See Byrd*, 629 F.3d at 1142–43 (weighing the *Bell* factors to determine whether the intrusion was reasonable).

Furthermore, none of the justifications Agent Noll offered for initiating the search are borne out by the facts. First, and most notably, the Ioanes were not detained during execution of the search warrant. Despite the fact that the Fourth Amendment permits limited detention of individuals on the premises while officers execute a search warrant, *see Michigan v. Summers*, 452 U.S. 692, 703–05 (1981), the agents informed the Ioanes they were free to go.[7] Yet Agent

women does not change that Agent Noll violated Shelly's privacy rights. *See York*, 324 F.2d at 455.

[6] Agent Noll contends that she does not recall escorting Shelly to the bathroom, but that such a practice is "standard procedure." However, nowhere in the record is this procedure memorialized, and it appears the other agents did not follow this "standard procedure" when Michael used the bathroom.

[7] In *Summers*, the Supreme Court held that it was reasonable, for Fourth Amendment purposes, to detain individuals while officers execute a lawful warrant on the premises. 452 U.S. at 703–05. This limited detention is justified by preventing flight, loss of incriminating evidence, and harm to occupants and officers. *Id.* at 702–03. However, the Supreme Court has not held that these government interests authorize the type of bodily privacy intrusion that took place here.

Noll contends that her intrusion into Shelly's bodily privacy was justified because of the inherent risk that Shelly might destroy evidence. However, the fact that the Ioanes were not detained belies Agent Noll's contention that she and the other agents were worried about Shelly destroying "floppy disks, smart cards and PC cards . . . [hidden] on her person under her dress." If the agents legitimately feared that Shelly might destroy evidence in the bathroom, they would not have permitted Shelly to leave the premises where she could have destroyed of the evidence elsewhere, and they would have been constitutionally permitted to do so. *See id.*

Second, Agent Noll argues that monitoring Shelly was necessary to ensure that Shelly did not have anything dangerous concealed in her clothing. Yet the search warrant authorized only the search of the premises, not the individuals on the premises. *See Ybarra v. Illinois*, 444 U.S. 85, 91–92 (1979) (rejecting the argument that individuals' Fourth Amendment rights are abrogated simply by virtue of the fact that they are on the premises where officers are executing a lawful search warrant). Furthermore, Agent Noll does not argue that she had a reasonable belief that Shelly was armed except for asserting that the agents had found other weapons on the premises. And, even if Agent Noll possessed an objectively reasonable belief that Shelly was armed and dangerous, this belief only would have justified a pat-down for weapons, not the intrusion into bodily privacy that occurred here. *See id.* at 92–93 (holding that an officer must possess a reasonable belief that an individual is armed and dangerous before conducting a weapons pat-down, even if the individual is on the premises where officers are executing a search warrant) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Terry v. Ohio*, 392 U.S. 1, 21–27 (1968)). Indeed, the agents had monitored Shelly in the kitchen for approximately 30 minutes before Shelly asked to

use the bathroom, and nowhere in the record does it reflect that the officers conducted a pat-down search of Shelly or Michael.

Third, Agent Noll asserts that other safety concerns justified monitoring Shelly while she used the bathroom because the bathroom was not secure, and Shelly could have gained access to the rest of the house through a second door in the bathroom, putting officers or herself at risk. However, by the time Shelly needed to use the bathroom, other agents already had checked the bathroom for weapons. Additionally, Agent Noll offers no explanation why watching Shelly use the bathroom was the only way to abate the risk that Shelly might flee, given that other officers might have been recruited to stand outside the bathroom's second door. *See Grummett*, 779 F.3d at 494 (concluding that the prison had not violated inmates' rights when the prison had devised the least intrusive means to serve the state security interests). Indeed, the agents permitted Michael, who was the subject of the investigation, to use the bathroom while a male agent stood outside the door. In sum, the justifications Agent Noll offers for initiating the search weigh in favor of a determination of unreasonableness.

Finally, the search was conducted in the Ioane's home bathroom. The law recognizes heightened privacy interests in the home, which arguably makes this intrusion more egregious, especially when Shelly herself was not the subject of the search. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001). The place of the search, therefore, also weighs in favor of unreasonableness.

Weighing the scope, manner, justification, and place of the search, a reasonable jury could conclude that Agent Noll's actions were unreasonable and violated Shelly's Fourth Amendment rights. Agent Noll's general interests in

preventing destruction of evidence and promoting officer safety did not justify the scope or manner of the intrusion into Shelly's most basic subject of privacy, her naked body. *See York*, 324 F.2d at 455; *see also Byrd*, 629 F.3d at 1141. We therefore affirm the district court on this issue.

### 3. Clearly Established

The second part of the qualified immunity test requires us to determine whether, at the time of Agent Noll's actions in June 2006, the law was clearly established. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is, the right must be established "in a more particularized, and hence more relevant, sense[.]" *Id.*; *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.") (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). This high standard is intended to give officers breathing room "to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "[I]t protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). While the Supreme Court has repeatedly admonished this court not to define clearly established law at a high level of generality, *see, e.g.*, *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015), we need not identify a prior identical action to conclude that the right is clearly established, *Anderson*, 483 U.S. at 640. We first look to binding precedent to determine whether a law was clearly established. *Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013).

By 2006, much of our Circuit's precedent regarding the right to bodily privacy had been established. First, from *York*, it was clearly established that an individual's naked body is the most basic subject of privacy. 324 F.2d at 455. Second, from *Grummett*, it was clearly established that casual, restricted, and obscured viewing of a prison inmate's naked body is constitutionally permitted if it is justified by legitimate government interests such as prison security needs. 779 F.2d at 492, 494–95. Finally, from *Sepulveda*, it was clearly established that a male parole officer's intentional viewing of a female parolee providing a urine sample, over the parolee's objection, is unconstitutional. 967 F.2d at 1416.

Additionally, it was clearly established by 2006 that an individual's Fourth Amendment right against unreasonable searches is not abrogated by virtue of her presence at the execution of a search warrant. *See Ybarra*, 444 U.S. at 91–93. In *Ybarra*, the Supreme Court held that an officer executing a search warrant on a premises must possess a reasonable belief that an individual is armed and dangerous before conducting a weapons pat-down of the individual. *Id.*

Taken together, the holdings from *York*, *Grummett*, *Sepulveda*, and *Ybarra* put the unlawfulness of Agent Noll's conduct beyond debate. *See al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate"); *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000) ("[Cl]osely analogous preexisting case law is not required to show that a right was clearly established.").

First, unlike the inmates in *Grummett* or the parolee in *Sepulveda*, Shelly's privacy interests had not been reduced. The agents were executing a search warrant at Shelly's house, but Shelly had not been detained. Furthermore,

Michael, and not Shelly, was the subject of the investigation. This makes the intrusion here even more significant than in *Grummett* or *Sepulveda*.

Second, it is clearly established that such a significant intrusion as occurred here never can be permitted in the absence of legitimate government interests, which here, plainly were lacking. *See Grummett*, 779 F.2d at 496; *Knights*, 534 U.S. at 118–19 ("[T]he reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.") (internal quotation marks and citation omitted).

Finally, if the Constitution prohibits an officer from conducting a weapons pat-down of an individual during execution of a search warrant in the absence of a reasonable belief that the individual is armed and dangerous, the intrusion here, for which Agent Noll has articulated no reasonable belief that Shelly was armed and dangerous, clearly was unconstitutional. *See Ybarra*, 444 U.S. at 91–93. And, even if Agent Noll had possessed a reasonable and articulable belief that Shelly was armed and dangerous, it is beyond debate that Agent Noll initially only would have been constitutionally permitted to conduct a pat-down search and not watch Shelly use the bathroom. *See id.* at 92–93 (citing *Terry*, 392 U.S. at 21–27). Accordingly, Agent Noll's decision to monitor Shelly while Shelly used the restroom, when Agent Noll clearly was not authorized to conduct a weapons pat down, arguably qualifies as "plainly incompetent." *See al-Kidd*, 563 U.S. at 743.

In sum, a reasonable officer in Agent Noll's position would have known that such a significant intrusion into bodily privacy, in the absence of legitimate government

justification, is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). We therefore conclude that Agent Noll is not entitled to qualified immunity.

**AFFIRMED.**

---

BEA, Circuit Judge, concurring in part and concurring in the judgment:

I agree with the majority that this case does not extend *Bivens* to a new context and that the district court did not err in denying Agent Noll's motion for summary judgment regarding Shelly Ioane's claim that Agent Noll violated Shelly's clearly established constitutional rights. However, because I disagree with the majority's holding that Agent Noll's actions violated Shelly's clearly established right to bodily privacy, I write separately.

I

A

As the majority correctly notes, we engage in a two-part test when determining whether a government agent is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). An officer is entitled to qualified immunity under this test unless: (1) the facts, construed in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the asserted violation. *Id.* Because this case reaches us on a denial of summary judgment, we must determine whether Agent Noll "would

be entitled to qualified immunity as a matter of law assuming all factual disputes were resolved in [Shelly's] favor." *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is, the right must be established "in a more particularized, and hence more relevant, sense." *Id*.; *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." (internal quotation marks omitted)).

This particularized requirement does not mean that there must be a prior case with identical facts—an officer can still be on notice that her conduct "violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002). "[B]ut existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Additionally, even if an officer violates a clearly established right, the officer is entitled to qualified immunity if the officer's "mistake as to what the law requires is reasonable." *Saucier*, 533 U.S. at 205.

B

Here, the majority concludes that Agent Noll was not entitled to qualified immunity as a matter of law, in part because Agent Noll violated Shelly's clearly established

Fourth Amendment right to bodily privacy when Agent Noll searched Shelly and viewed her naked body during the course of executing a search warrant at the Ioanes' residence. To reach that conclusion, it is necessary for the majority to hold that a female law enforcement officer violates a clearly established right to bodily privacy when she unreasonably views the naked body of a female suspect.

The majority cites three of our prior cases regarding bodily privacy to support the existence of such a clearly established right. But the cases cited by the majority are distinguishable from the instant case in significant ways. Most problematically, none of the cases cited by the majority state that there is a constitutional right to bodily privacy that is violated by same-sex observation.

For instance, in *York v. Story*, 324 F.2d 450, 451–53 (9th Cir. 1963), where we first announced the right to bodily privacy, a female victim was brought to the police station after an altercation. Male officers told her that they needed to photograph her naked body to preserve evidence of bruising. *Id.* The woman repeatedly objected, stated that she did not want to be photographed, and contended that there was no evidence of bruising to document. *Id.* The officers photographed the woman anyway and distributed the photos throughout the department. *Id.* We held that the officers' actions violated the woman's right to bodily privacy. *Id.*

But *York* does not support a clearly established right that was violated in this case for a number of reasons. First, the privacy violation in *York* was much more severe because the photographs were disseminated to other officers. Here, the observation was in a one-on-one setting. Second, even the *York* court recognized that the fact that the officers were male and the victim was female was significant, stating: "We

cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured from view of strangers, *and particularly strangers of the opposite sex*, is impelled by elementary self-respect and personal dignity." *Id*. at 455 (emphasis added).

Next, the majority cites *Grummett v. Rushen*, 779 F.2d 491 (9th Cir. 1985). In *Grummett*, male inmates sued the department of corrections for allowing female guards to observe them in the showers and while using the restroom, claiming a violation of their right to privacy. *Id.* at 492–93. This court held that there was no violation of the right to bodily privacy because the inmates had a reduced privacy interest, the female guards observed the inmates naked only from a distance, and the department's policies were, on the whole, reasonable. *Id.* at 494–96.

Again, *Grummett* does not support a clearly established right that was violated in this case. First, the plaintiffs in *Grummett* exclusively challenged cross-sex observations— the plaintiffs did not even attempt to argue that male guards' observations of naked male inmates violated the inmates' right to bodily privacy. As a result, this court's analysis was entirely framed in terms of whether cross-sex observations and searches violated the right to bodily privacy. Second, the *Grummett* court *found no constitutional violation* even though the observations were cross-sex. Although *Grummett* stands for the proposition that some right to bodily privacy exists, it is difficult to see how *Grummett* could have created a clearly established constitutional right to be free from same-sex observation.

Finally, the majority cites *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992). In *Sepulveda*, we held that a male probation officer violated a female probationer's right to bodily privacy when the male probation officer

observed the female probationer urinating in a bathroom stall during a urinalysis test. 967 F.2d at 1415. This is, without doubt, the most factually analogous case cited by the majority.

And yet, several factors indicate that Agent Noll's conduct was not clearly proscribed by this court's opinion in *Sepulveda*. First, and most obviously, our ruling in *Sepulveda* hinged on the fact that the probation officer was of the opposite sex, and all of the cases the *Sepulveda* court cited involved observation by members of the opposite sex. *Id*. Indeed, the *Sepulveda* court itself cited *York* for the proposition that "[t]he desire to shield one's unclothed figured from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Id*. at 1415 n.5 (quoting *York*, 324 F.2d at 455). Thus, it is unclear how *Sepulveda* can be read to create a clearly established constitutional right to be free from naked observation by members of *the same sex*.

Second, in concluding that the probation officer's conduct was not "reasonable," the Court relied on the fact that his conduct violated department of corrections policies. *Id*. at 1416. Here, by contrast, Agent Noll's uncontradicted declaration establishes that her conduct comported with IRS policy. Again, at a minimum, this fact provides a basis to conclude that Agent Noll's mistake as to whether she was violating the right established by *Sepulveda* was reasonable.

Finally, *Sepulveda* did not occur in the context of the execution of a search warrant. The majority argues that this means Shelly likely had broader rights than the probationer in *Sepulveda*. But that argument ignores the factual context relevant to determining whether *Sepulveda* sufficiently defined the contours of the right at issue. In particular, *Sepulveda* contains no discussion regarding how to weigh

the right to bodily privacy against the interests of officer safety or the preservation of evidence.

The majority dismisses many of these concerns without serious examination.  Most notably, the majority asserts (in a footnote) that, although every bodily privacy case this circuit has decided involved cross-sex observation, "gender was not central" to the analysis in any of those cases.  *See* Maj. Op. at 15 n.5.  Thus, the majority concludes, "[the fact t]hat Agent Noll and Shelly both are women does not change that Agent Noll violated Shelly's privacy rights."  *See id*.

Gender is not central?

It is impossible to square this conclusion with our precedent.  Every bodily privacy case cited by the majority involved cross-sex observation and every case noted that the cross-sex nature of the observation was a significant part of the court's analysis.  No case cited by the majority discusses whether same-sex observation is subject to the same sort of analysis or scrutiny.  In fact, language from *York* and *Sepulveda*—and the result from *Grummett*—strongly suggest that same-sex observations *are not* subject to the same sort of scrutiny as cross-sex observations.

The majority is likely correct that Agent Noll's actions were unreasonable, and Agent Noll may have violated Shelly's constitutional right to bodily privacy during the search.  But the existence of a constitutional violation alone is insufficient to deny qualified immunity—we must find that the right at issue was "clearly established."  Our precedent at the time of the alleged violation in this case did not put the issue of whether same-sex observation violates the right to bodily privacy "beyond debate."  *See al-Kidd*, 563 U.S. at 741.

The majority could have used this case to clarify the law regarding the right to bodily privacy and announced that the right applied in both same-sex and cross-sex situations alike. Perhaps that is the correct result. But the majority cannot, in one fell swoop, both announce for the first time that the scope of the bodily privacy right includes same-sex observations and, at the same time, hold that the right was clearly established at the time of the violation.[1]

## II

Nonetheless, I concur in the majority's ultimate conclusion that the district court did not err in denying Agent Noll's motion for summary judgment. Drawing all factual inferences in favor of Shelly, as we must, Agent Noll's actions violated Shelly's Fourth Amendment rights under the Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85 (1979).

In *Ybarra*, police received a tip that a bartender was likely to be dealing heroin at his bar on a particular night. *Id.* at 87–90. The police used that tip to obtain a search warrant for the bar and the bartender. *Id.* When the police arrived at the bar, they announced that they were executing a search warrant and then stated that they were going to perform a weapons pat-down on all of the patrons of the bar who were

---

[1] The majority is defining the right of bodily privacy at a higher level of generality—same *and* cross-sex observation of nudity—than the level of generality here involved: same-sex observation. This is precisely the sort of judicial decision-making for which the Supreme Court has repeatedly chastised us. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has 'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" (internal quotation marks omitted)).

present. *Id.* During that weapons pat-down, an officer found heroin on a patron of the bar. *Id.*

During the ensuing criminal case, the patron moved to suppress the evidence found in the pat-down search, arguing that the officer had no probable cause to search him. *Id.* The state courts held that the search was permissible because a state statute authorized officers executing a search warrant to detain and search anyone at the premises. *Id.*

The Supreme Court reversed, holding that the search was unconstitutional. The Supreme Court held that the officers needed individualized probable cause as to the patron in order to conduct an evidence search of his person and that the search warrant for the premises combined with the patron's presence at the premises was insufficient. *Id.* at 90–92. Additionally, the Court held that any weapons frisk needed to be supported by a "reasonable belief" that the patron was armed and dangerous. *Id.* at 92–94. Finally, the Court rejected the state's argument that such searches were necessary as part of drug enforcement because of the ease with which evidence of a drug crime could be concealed, passed from person to person, and disposed of. *Id*. at 94–96.

In short, *Ybarra* stands for the proposition that a search warrant for a particular premises does not give the officers executing the warrant the right to search individuals who are present, but who the officers do not have independent probable cause to search. Here, Shelly was not the subject of the investigation and the search warrant did not authorize a search of her person, only of the premises. As a result, under *Ybarra*, any search of Shelly needed to be supported by independent probable cause or, in the case of a weapons frisk, a reasonable belief that she was armed and dangerous.

Neither of those conditions was met in this case. Agent Noll had no individualized probable cause to search Shelly. Consequently, there was no basis to conduct an evidence search of Shelly's person. Additionally, Agent Noll likely lacked any reasonable belief that Shelly was armed and dangerous. Although Agent Noll knew there were firearms in the house, those firearms did not belong to Shelly and there was no other basis on which to conclude that Shelly was armed and dangerous. Regardless, even if Agent Noll had a reasonable basis to believe Shelly was armed and dangerous, her actions in this case plainly exceeded the limits of the sort of weapons pat-down authorized by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).

As a result, I would hold that Agent Noll's actions violated Shelly's Fourth Amendment rights as clearly established in *Ybarra*.

### III

In conclusion, Agent Noll's actions did not violate Shelly's *clearly established* right to bodily privacy. However, drawing factual inferences in Shelly's favor, Agent Noll's actions in this case likely violated Shelly's constitutional rights under *Ybarra*. On that basis, I would hold that the district court was correct to deny Agent Noll's motion for summary judgment. As a result, I CONCUR in the judgment of the majority opinion.