**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| PATRICIA POLANCO; VINCENT POLANCO; SELENA POLANCO; GILBERT POLANCO, Deceased, | No. 22-15496 |
|  | D.C. No. 3:21-cv-06516-CRB |
| *Plaintiffs-Appellees*, | |
| v. | |
|  | OPINION |
| RALPH DIAZ; ESTATE OF ROBERT S. THARRATT; RONALD DAVIS, Warden; RONALD BROOMFIELD; CLARENCE CRYER; ALISON PACHYNSKI, MD; SHANNON GARRIGAN, MD, | |
| *Defendants-Appellants*, | |
| and | |
| STATE OF CALIFORNIA; CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; SAN QUENTIN STATE PRISON; LOUIE ESCOBELL, RN; MUHAMMAD FAROOQ, MD; KIRK A TORRES, MD, | |
| *Defendants*. | |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted March 8, 2023
San Francisco, California

Filed August 7, 2023

Before:  Michelle T. Friedland and Ryan D. Nelson, Circuit
Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Friedland;
Dissent by Judge R. Nelson

---

## SUMMARY[**]

---

### Civil Rights/State-Created Danger/COVID-19

The panel affirmed the district court's denial of
defendants' motion to dismiss a complaint on the basis of
qualified immunity in an action brought pursuant to 42
U.S.C. § 1983 by the family of San Quentin Prison guard
Gilbert Polanco, who died from complications caused by
COVID-19.

---

[*] The Honorable Kathleen Cardone, United States District Judge for the
Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

A few months into the COVID-19 pandemic, high-level officials in the California prison system transferred 122 inmates from the California Institution for Men, where there was a widespread COVID-19 outbreak, to San Quentin State Prison, where there were no known cases of the virus. The transfer sparked an outbreak of COVID-19 at San Quentin that ultimately killed Polanco and over twenty-five inmates.

The panel held that based on the allegations in the complaint, defendants were not entitled to qualified immunity. Plaintiffs sufficiently alleged a violation of Polanco's substantive due process right to be free from a state-created danger, under which state actors may be liable for their roles in creating or exposing individuals to danger they otherwise would not have faced.

Taking the allegations in the complaint as true, the failure to adequately test or screen inmates prior to the transfer, the transfer itself, and the decision to house the inmates in open-aired cells upon arriving at San Quentin, among other things, placed Polanco in a much more dangerous position than he was in before, the danger was particularized and sufficiently severe to raise constitutional concerns, and defendants were aware of the danger that transferring potentially COVID-positive inmates to San Quentin would pose to employees.

The panel held that the unlawfulness of defendants' alleged actions was clearly established by the combination of two precedents: *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), which recognized a claim under the state-created danger doctrine arising out of a prison's disregard for the safety of a female employee who was raped after being required to work alone with an inmate known to be likely to commit a violent crime if placed alone with a woman; and

*Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016), which recognized a claim under the state-created danger doctrine arising from an employer's deliberate indifference to workplace conditions that exposed an employee to dangerous airborne mold. Accordingly, defendants were not entitled to qualified immunity.

Dissenting, Judge R. Nelson would hold that defendants were entitled to qualified immunity because no clearly established law placed defendants on notice that their alleged mismanagement of the COVID-19 pandemic at San Quentin prison was unconstitutional. Contrary to Supreme Court guidance, the majority employed a high level of generality to determine that the law was clearly established.

**COUNSEL**

Joshua C. Irwin (argued), Stefano Abbasciano, and Hima Raviprakash, Deputy Attorneys General; Fiel D. Tigno, Supervising Deputy Attorney General; Chris A. Knudsen, Senior Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office; Oakland, California; for Defendants-Appellants.

Michael J. Haddad (argued), Julia Sherwin, Brian Hawkinson, and Teresa Allen, Haddad & Sherwin LLP, Oakland, California, for Plaintiffs-Appellees.

Adam R. Pulver, Allison M. Zieve, and Scott L. Nelson, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen.

# OPINION

FRIEDLAND, Circuit Judge:

A few months into the COVID-19 pandemic, high-level officials in the California prison system transferred 122 inmates from the California Institution for Men, where there was a widespread COVID-19 outbreak, to San Quentin State Prison, where there were no known cases of the virus.  The transfer sparked an outbreak of COVID-19 at San Quentin that ultimately killed one prison guard and over twenty-five inmates.  The guard's family members sued the prison officials, claiming that the officials violated the guard's due process rights.  The officials moved to dismiss, arguing that they were entitled to qualified immunity.  The district court denied the motion with respect to some of the officials, who then filed this interlocutory appeal.  We affirm.

## I.

### A.

On March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency due to COVID-19.[1]  The declaration was quickly followed by other emergency measures at the state and local levels, including shelter-in-place orders and mask mandates.  Later that month, Governor Newsom issued an executive order suspending the intake of inmates into all state correctional facilities.  Around the same time, California Correctional Health Care Services adopted a policy opposing the transfer of inmates between

---

[1] In an appeal of a denial of qualified immunity at the motion to dismiss stage, we accept as true all well-pleaded allegations in the Complaint. *See Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012).

prisons, reasoning that transfers would "carr[y] [a] significant risk of spreading transmission of the disease between institutions."

Defendants—a group of high-level officials at San Quentin and the California Department of Corrections and Rehabilitation ("CDCR")—were aware of the risks that COVID-19 posed in a prison setting. All had been briefed about the dangers of COVID-19, the highly transmissible nature of the virus, and the necessity of taking precautions (such as social distancing, mask-wearing, and testing) to prevent its spread. Defendants were also aware that containing an outbreak at San Quentin would be particularly difficult due to its tight quarters, antiquated design, and poor ventilation. As of late May 2020, though, San Quentin appeared to be weathering the storm with no known cases of COVID-19. Other prisons were not so fortunate. The California Institution for Men ("CIM") suffered a severe outbreak, which by late May had killed at least nine inmates and infected over six hundred.

In an attempt to prevent further harm to CIM inmates, on May 30, Defendants transferred 122 CIM inmates with high-risk medical conditions to San Quentin. The transfer did not go well. Most of the men who were transferred had not been tested for COVID-19 for over three weeks, and none of the transferred inmates were properly screened for symptoms before being "packed" onto buses to San Quentin "in numbers far exceeding COVID-capacity limits that CDCR had mandated for inmate safety." Although some inmates exhibited symptoms while on the bus, Defendants did not quarantine the newly arriving inmates. They placed nearly all the transferred inmates in a housing unit with grated doors (allowing air to flow in and out of the cells) and had them

use the same showers and eat in the same mess hall as other inmates.

Two days after the inmates arrived at San Quentin, the Marin County Public Health Officer learned of the transfer and scheduled an immediate conference call with some Defendants. On the call, the Public Health Officer recommended that the transferred inmates be completely sequestered from the original San Quentin population, that all exposed inmates and staff be required to wear masks, and that staff movement be restricted between different housing units to prevent the spread of COVID-19. Despite being timely informed of the Public Health Officer's recommendations, Defendants did not heed his advice. Instead, they ordered that the Public Health Officer be informed that he lacked the authority to mandate measures in a state-run prison.

COVID-19 soon began to sweep through San Quentin. Within days of the transfer, twenty-five of the transferred inmates had tested positive. Over a three-week period, San Quentin went from zero confirmed cases of COVID-19 to nearly five hundred.

In mid-June, a court-appointed medical monitor of California prisons (the "Receiver")[2] requested that a group of health experts investigate the outbreak at San Quentin. The health experts wrote an "Urgent Memo" warning that the COVID-19 outbreak at San Quentin could escalate into

---

[2] In response to a class action, the United States District Court for the Northern District of California held in 2005 that the medical services in California prisons failed to meet the constitutional minimum. *See Plata v. Schwarzenegger*, No. C01-1351, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005). It accordingly appointed a receiver tasked with establishing a constitutionally adequate medical system. *See id.*

a "full-blown local epidemic and health care crisis in the prison and surrounding communities" if not contained. The memo criticized many practices at San Quentin, noting, for instance, that personal protective equipment and masks were not provided to staff and inmates despite being readily available. Even when staff had masks, many wore them improperly or failed to wear them at all. The prison's testing protocol, too, was inadequate, suffering from what the memo considered "completely unacceptable" delays. Defendants were informed of the memo but did not adopt its recommendations. Indeed, when two research labs offered to provide COVID-19 testing at the prison, Defendants refused the offers, even though one offered to do so for free.

The outbreak continued to spread. By July, more than 1,300 inmates and 184 staff had tested positive. Two months later, those numbers had ballooned to more than 2,100 inmates and 270 staff. As of early September, approximately twenty-six inmates and one guard had died of COVID-19.

**B.**

That one guard was Sergeant Gilbert Polanco. At the time of the transfer, Polanco was fifty-five years old and had worked at San Quentin for more than two decades. Polanco had multiple health conditions that put him at high risk of mortality if he were to contract COVID-19, including obesity, diabetes, and hypertension. During the pandemic, one of his duties was to drive sick inmates—including those with COVID-19—to local hospitals. On those trips, Defendants refused to provide Polanco (or the inmates he was driving) with personal protective equipment.

In late June, Polanco contracted COVID-19.  By July, his condition had worsened, and he was admitted to the hospital. He died of complications caused by COVID-19 in August.

## C.

Polanco's wife and children (collectively, "Plaintiffs") sued Defendants under 42 U.S.C. § 1983 in the United States District Court for the Northern District of California.  Their Complaint alleges that Defendants violated Polanco's substantive due process rights by affirmatively, and with deliberate indifference, placing him in danger.  It also alleges that Defendants violated Plaintiffs' substantive due process rights to familial association.[3]

Defendants moved to dismiss, arguing, among other things, that they are entitled to qualified immunity on Plaintiffs' constitutional claims.  The district court rejected that argument, holding that Defendants are not entitled to qualified immunity on the face of the Complaint.[4] Defendants timely appealed the district court's denial of qualified immunity.

## II.

We have jurisdiction under the collateral order doctrine to review a district court's rejection of a qualified immunity defense at the motion to dismiss stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 671–72 (2009), and we review such a denial de novo, *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131–

---

[3] The Complaint also alleges various statutory and common law claims that are not at issue in this appeal.

[4] Plaintiffs also asserted claims against some high-level officials from CIM.  The district court granted the motion to dismiss with respect to those defendants.  That aspect of the district court's order is not at issue in this appeal.

32 (9th Cir. 2018). When engaging in such review, we "accept[] as true all well-pleaded allegations" and "construe[] them in the light most favorable to the non-moving party." *Id.* at 1132 (quoting *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012)).

## III.

We must affirm the district court's denial of qualified immunity if, accepting all of Plaintiffs' allegations as true, Defendants' conduct "(1) violated a constitutional right that (2) was clearly established at the time of the violation." *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022). At the motion to dismiss stage, "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)). Based on the Complaint here, we hold that Defendants are not entitled to qualified immunity.

## A.

Plaintiffs sufficiently allege a violation of Polanco's due process right to be free from a state-created danger.

The Fourteenth Amendment's mandate that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law" confers both procedural and substantive rights. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 194–95 (1989) (alterations in original) (quoting U.S. Const. amend. XIV). The substantive component of that clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)

(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The Due Process Clause does not "impose an affirmative obligation on the State" to protect a person's life, liberty, or property; it acts as a "limitation on the State's power to act" rather than a "guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. The "general rule," then, is that "a state actor is not liable under the Due Process Clause 'for its omissions.'" *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016) (quoting *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)).

But there are exceptions to this general rule. *See id.* As relevant here, under the state-created-danger doctrine, state actors may be liable "for their roles in creating or exposing individuals to danger they otherwise would not have faced." *Id.* (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006)). In the context of public employment, although state employers have no constitutional duty to provide their employees with a safe working environment, *see Collins*, 503 U.S. at 126, the state-created-danger doctrine holds them liable when they affirmatively, and with deliberate indifference, create or expose their employees to a dangerous working environment. We have recognized, for instance, that a state employer can be liable under the state-created-danger doctrine for knowingly assigning an employee to work in a building infected with toxic mold, *see Pauluk*, 836 F.3d at 1125, or for requiring a prison employee to work alone with an inmate likely to cause her serious harm, *see L.W. v. Grubbs*, 974 F.2d 119, 123 (9th Cir. 1992).

To state a due process claim under the state-created-danger doctrine, a plaintiff must first allege "affirmative conduct on the part of the state," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Munger*, 227 F.3d at 1086), that exposed him to "an actual, particularized danger

that [he] would not otherwise have faced," *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).  Second, a plaintiff must allege that the state official acted with "deliberate indifference" to that "known or obvious danger." *Id.* (quoting *Patel*, 648 F.3d at 971–72).

## 1.

Plaintiffs' allegations satisfy the first requirement, which has several components.  The state must have taken actions that placed the plaintiff in a "worse position" than he would have been in "had [the state] not acted at all." *Pauluk*, 836 F.3d at 1124 (alteration in original) (quoting *Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007)).  The act must have exposed the plaintiff to an "actual, particularized danger," and the resulting harm must have been foreseeable. *Id.* at 1125 (quoting *Kennedy*, 439 F.3d at 1063).

The transfer of 122 inmates from CIM to San Quentin was plainly affirmative conduct, as was the decision to house the transferred inmates in open-air cells and have them share facilities with the general San Quentin population.  And the transfer placed Polanco in a much more dangerous position than he was in before.  Prior to the transfer, there were no known cases of COVID-19 at San Quentin; after the transfer, there were many.  That harm was foreseeable, because Defendants transferred inmates from a prison experiencing an active COVID-19 outbreak to a prison that had managed to avoid such an outbreak—and did so without properly testing or screening the transferred inmates for COVID-19, revising the plan when inmates fell ill on the buses, or quarantining the inmates upon their arrival.  The allegations

paint a clear picture: San Quentin had managed to keep COVID-19 out, but Defendants brought it in.[5]

So too was the danger "particularized." Affirmative state action that exposes a broad swath of the public to "generalized dangers" cannot support a state-created-danger claim. *See Sinclair v. City of Seattle*, 61 F.4th 674, 676, 683 (9th Cir. 2023) (holding that the plaintiff had not alleged a state-created-danger claim because "the City-created danger was a generalized danger experienced by all those members of the public who chose to visit" a certain part of the city). But a danger can be "particularized" even if it is directed toward a group rather than an individual. *See Hernandez*, 897 F.3d at 1133 (holding that the danger to which the state exposed a group of protesters was sufficiently particularized to support a state-created-danger claim). The danger here falls into the latter category because the transfer exposed a "discrete and identifiable group"—prison guards and inmates at San Quentin—to the dangers of COVID-19. *See Sinclair*, 61 F.4th at 683.

Finally, the danger to which Polanco was exposed was sufficiently severe to raise constitutional concerns. Although our precedent has not elaborated on the level of harm required to sustain a state-created-danger claim, it has been implicit in our cases that not any risk will do—the harm must be severe enough to constitute a "danger." *See, e.g.*, *Grubbs*, 974 F.2d at 120 (assault, battery, kidnapping, and rape); *Kennedy*, 439 F.3d at 1058 (murder); *Pauluk*, 836

---

[5] As alleged in the Complaint, each Defendant was involved in the administrative decisions underlying the due process claim. We accordingly reject Defendants' argument that some Defendants are entitled to qualified immunity because of their status as "medical officials."

F.3d at 1120 (serious illness leading to death); *Hernandez*, 897 F.3d at 1130 (assault and battery resulting in serious injuries); *Martinez*, 943 F.3d at 1269 (physical and sexual violence).  We do not attempt to delimit here the range of harms that count, but we are confident that exposure to COVID-19, at least in a pre-vaccine world, does.

Defendants respond that they cannot be held responsible for Polanco's death, because "[g]uards are free to refuse to work in a prison."  In Defendants' view, Polanco assumed the risk of COVID-19 exposure by accepting—and not quitting—his job as a corrections officer.  But that argument runs headlong into *Pauluk*, in which we held that a public employer's deliberately indifferent transfer of an employee to an office building infected with toxic mold would be a constitutional violation even if the employee was aware of the mold and presumably could have quit his job when he learned of the transfer.  *See* 836 F.3d at 1125.  If the employee's ability to leave his post did not defeat the constitutional claim in *Pauluk*, it cannot defeat the claim here.[6]

---

[6] Defendants rely on a Third Circuit case that suggested in dicta that public employees' freedom to leave their jobs may limit the scenarios in which employees can bring claims under the state-created-danger doctrine to those involving "deliberate misrepresentations" by their public employer about the level of danger.  *See Kaucher v. County of Bucks*, 455 F.3d 418, 430 (3d Cir. 2006).  But the Third Circuit has since refrained from embracing that dicta, describing *Kaucher* as standing for the proposition that "a government employee may bring a substantive due process claim against his employer if the state compelled the employee to be exposed to a risk of harm not inherent in the workplace." *Kedra v. Schroeter*, 876 F.3d 424, 436 n.6 (3d Cir. 2017).  That description of the state-created-danger doctrine aligns with the doctrine in our circuit.

**2.**

Plaintiffs' allegations also satisfy the "deliberate indifference" requirement. In the context of a state-created-danger claim, deliberate indifference is a subjective standard that requires a plaintiff to allege facts supporting an inference that the official "recognized an unreasonable risk and actually intended to expose the plaintiff to such risk." *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160–61 (9th Cir. 2021).[7]

The Complaint alleges that Defendants were aware of the danger that transferring potentially COVID-positive inmates to San Quentin would pose to San Quentin's employees. By the time of the transfer, state and local governments had enacted a range of emergency health measures designed to prevent the spread of COVID-19, including requirements to mask when interacting with individuals outside one's household. As Plaintiffs allege, by May 2020, anyone in California "vaguely paying attention" to the news would have understood that COVID-19 was "highly contagious" and "potentially deadly" and would have been aware of the basic rules to prevent its spread, such as limiting contact with people outside one's household, social-distancing, wearing masks, quarantining after exposure, and testing. In addition, California Correctional Health Care Services had opposed transfers between prisons because of the "significant risk" of

---

[7] In a different context, we held that the requisite mental state for a Fourteenth Amendment due process claim is an objective form of deliberate indifference. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016) (en banc). But we have continued to apply a purely subjective test to state-created-danger claims. *See Herrera*, 18 F.4th at 1160–61 (recognizing a tension between the requisite mental states in *Castro* and post-*Castro* state-created-danger cases but holding that it was bound by the latter cases).

transmitting the disease between institutions.  Plaintiffs also allege that Defendants understood that San Quentin's construction posed unique challenges to containing a potential outbreak due to its tight quarters, shared spaces, and poor ventilation.

Despite that knowledge, Defendants went ahead with the transfer.  That allegation, alone, does not compel an inference that Defendants were deliberately indifferent—for example, had Defendants acted to mitigate the risks inherent in a transfer, those efforts could show that Defendants had not intended to expose prison employees to an unreasonable risk.  *See Patel*, 648 F.3d at 976 (holding that a teacher's "lapse in judgment" did not rise to the level of deliberate indifference because she was "fairly active" in attempting to protect the plaintiff); *Herrera*, 18 F.4th at 1163–64 (holding that a school aid was not deliberately indifferent to the dangers a student faced because the aid neither "abandoned" the student nor "left him completely without protection").

But according to the Complaint, Defendants did not attempt to mitigate the risk.  Despite their knowledge of the dangers of COVID-19 and of the basic measures to prevent its spread, Defendants did not take precautions to avoid transferring COVID-positive inmates to San Quentin or to decrease the likelihood that COVID-19 would spread from transferred inmates to San Quentin employees.  They moved ahead with the transfer while knowing that the inmates' test results were woefully out of date.  They failed to properly screen the inmates for symptoms before the transfer; many inmates were screened too early to determine whether they had symptoms before boarding crowded buses.  And Defendants increased the risk that COVID-19 would spread throughout the prison by placing the transferred inmates in cells with grated rather than solid doors, having transferred

inmates use the same showers and mess hall as the other inmates, and failing to provide masks or testing to inmates and staff.

Defendants protest that the outbreak at CIM necessitated a rapid transfer. But even if we were to assume that the transfer itself could not have been done more carefully, Defendants disregarded the safety of San Quentin employees after the transfer, repeatedly ignoring express warnings that their COVID-19 policies were insufficient and dangerous. Two days after the transfer, the Marin County Public Health Officer recommended that all transferred inmates be completely sequestered from the original San Quentin population and that all exposed inmates and staff be required to wear masks. Rather than adopt the Health Officer's recommendations, Defendants ordered that the Officer be informed that he lacked the authority to mandate measures in their prison. Further warnings came a few weeks later, when a group of health experts prepared an "Urgent Memo" for Defendants. Those experts cautioned that San Quentin was at high risk of a "catastrophic super-spreader event" due to its inadequate testing and "grave lack of personal protective equipment and masks." Defendants did not follow those experts' recommendations to adopt masking and testing requirements either, despite the availability of both masks and tests.

Taking the allegations in the Complaint as true, this is a textbook case of deliberate indifference: Defendants were repeatedly admonished by experts that their COVID-19 policies were inadequate, yet they chose to disregard those warnings. *See Hernandez*, 897 F.3d at 1136 (holding that allegations rose to the level of subjective deliberate indifference because defendants were "aware of the danger

to the plaintiffs" and yet "continued" their problematic course of conduct).

In their briefs on appeal, Defendants offer a different telling of the facts. In their view, the allegations do not rise to the level of deliberate indifference because Defendants faced an impossible tradeoff: the welfare of high-risk CIM inmates on the one hand and the safety of San Quentin employees on the other. The Constitution, Defendants argue, cannot require prison officials to place the safety of their staff above the safety of the inmates entrusted to their care.

We are sympathetic to the competing priorities that public officials had to navigate during the early days of the COVID-19 pandemic. But the specific tradeoff that Defendants invoke here is incompatible with the Complaint. Taking Plaintiffs' allegations as true and drawing reasonable inferences in their favor, as we must at this stage of the proceedings, properly testing and screening the inmates before the transfer would have made the transfer safer for both San Quentin employees and the transferred inmates. Quarantining the transferred inmates, too, would have benefitted all parties. And when it comes to masks and tests, the Complaint expressly alleges that there was *no* such tradeoff, asserting that masks and other personal protective equipment were "easily obtainable" and highlighting two separate occasions on which Defendants turned down labs' offers to provide COVID-19 testing at San Quentin, at least one of which offered to do so for free. On the face of the Complaint, there is no room for Defendants' version of the events. We therefore hold that Plaintiffs have sufficiently alleged that Defendants acted with deliberate indifference toward the health and safety of San Quentin employees,

including Polanco, satisfying the second prong of the state-created-danger claim.

**B.**

Not only has Polanco alleged a violation of his due process right to be free from a state-created danger, but that right was also "clearly established at the time of the violation." *Pauluk*, 836 F.3d at 1125 (quoting *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010)).

For the unlawfulness of an officer's conduct to be "clearly established," it must be the case that, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he [wa]s doing' [wa]s unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "In other words, existing law must have placed the [un]constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

Plaintiffs have met that demanding standard because the unlawfulness of Defendants' alleged actions was clearly established by the combination of two of our precedents: *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), and *Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016).[8]

---

[8] We routinely rely on the intersection of multiple cases when holding that a constitutional right has been clearly established. *See, e.g.*, *Ioane v. Hodges*, 939 F.3d 945, 957 (9th Cir. 2018) ("Taken together, the holdings from [four prior cases] put the unlawfulness of [the officer's] conduct beyond debate."); *Gordon v. County of Orange*, 6 F.4th 961, 971 (9th Cir. 2021) (holding that the relevant right was clearly established by

In *Grubbs*, we recognized a state-created-danger claim arising out of a prison's disregard for the safety of one of its employees.  The plaintiff, a nurse working in an Oregon correctional institution, was raped by an inmate.  974 F.2d at 120.  She sued her supervisors under § 1983, claiming that they had violated her due process rights by requiring her to work alone with a "violent sex offender" who the officers knew was "very likely to commit a violent crime if placed alone with a female."  *Id.*  We denied the state's motion to dismiss because the nurse alleged that her supervisors "took affirmative steps to place her at significant risk" and "knew of the risks."  *Id.* at 122.

*Grubbs* presents a close analogy to this case.  There, as here, a public employee was harmed due to her employer's deliberately indifferent conduct.  And there, as here, the employee worked in a correctional institution and was harmed in the process of carrying out her job duties.  Yet there are also differences; the danger in *Grubbs* stemmed from a violent inmate, whereas Polanco was harmed by a disease that he contracted at his workplace.  If *Grubbs* were the only relevant precedent, whether Polanco's due process right was clearly established might be a close question.

But *Grubbs* does not stand alone.  In *Pauluk*, we again recognized a claim under the state-created-danger doctrine, this time arising from an employer's deliberate indifference to workplace conditions posing serious health risks.  A state

---

the "principles drawn from" three cases); *Ballou v. McElvain*, 29 F.4th 413, 426-27 (9th Cir. 2022) (holding that a right was clearly established by the intersection of two cases).  This approach is required by the Supreme Court's instruction that qualified immunity is improper where "a legal principle [has] a sufficiently clear foundation in then-existing precedent."  *Wesby*, 138 S. Ct. at 589.

employee there alleged that his employer violated his due process rights by transferring him to an office building that the employer knew was infested with toxic mold that the employee would foreseeably breathe.  836 F.3d at 1119; *see also id.* at 1134 (Noonan, J., dissenting) ("Pauluk . . . died from inhaling poisonous air in the workplace.").  We held that the plaintiff had produced sufficient evidence from which a reasonable jury could find a constitutional violation by concluding that the state employer affirmatively transferred the employee to the infested building—placing him in a "worse position" than he had been in before—and that the employer acted with deliberate indifference in exposing the employee to the dangerous mold.  *Id.* at 1125.

Together, *Grubbs* and *Pauluk* put public officials on notice that they may be liable under the state-created-danger doctrine in a scenario where:

(1)  the harmed party is their employee (*Grubbs* and *Pauluk*);

(2)  the harmed party encountered the relevant danger in the course of carrying out employment duties in a correctional facility (*Grubbs*);

(3)  the danger was created by requiring the employee to work in close proximity to people who posed a risk (*Grubbs*);

(4)  the physical conditions of the workplace contributed to the danger (*Pauluk*); and

(5)  the danger was a potentially fatal illness caused by breathing contaminated air (*Pauluk*).

Defendants argue that this case is nonetheless unique because it involves a (novel) viral outbreak.  But after

*Pauluk*, officers were on notice that they could be held liable for affirmatively exposing their employees to workplace conditions that they knew were likely to cause serious illness, including dangers invisible in the air.  And taking Plaintiffs' allegations as true—again, as we must do at this stage of the proceedings—Defendants knew just that.[9]  The fact that the illness here was a newly discovered communicable disease rather than a toxin would not have led a reasonable official to conclude that the danger could be ignored.[10]  *See al-Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").  COVID-19 may have been unprecedented, but the legal theory that Plaintiffs assert is not.

## C.

Defendants raise three additional arguments for why they are entitled to qualified immunity.  None succeed.

---

[9] Underpinning much of the dissent is the premise that conditions were simply too uncertain in the spring of 2020 to hold government officials liable for their responses to COVID-19.  But at the motion to dismiss stage, we must take all of Plaintiffs' allegations as true, and Plaintiffs have plausibly alleged that Defendants knew of, and consciously disregarded, the risk that COVID-19 posed to San Quentin employees.  *See supra* Section III.A.2.  If Defendants can show that they in fact lacked such awareness, they may be entitled to qualified immunity at a later stage of this litigation.

[10] In other contexts, we have rejected the argument that the novelty of a particular means of causing harm should, in and of itself, insulate officials from liability.  *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012) ("An officer is not entitled to qualified immunity on the ground that the law is not clearly established every time a novel method is used to inflict injury." (cleaned up) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001))).

**1.**

Defendants urge us to take judicial notice of testimony that the Receiver gave before the California State Senate, which they argue shows that they were just following orders.

A court may take judicial notice of facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The fact that the Receiver testified before the California Senate is judicially noticeable under that standard, but that does not mean we can consider the testimony for its truth. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."). Considering the Receiver's version of the events would transform Defendants' motion to dismiss into a motion for summary judgment without offering Plaintiffs an opportunity to depose the Receiver and further develop the record. *See* Fed. R. Civ. P. 12(d). The district court did not abuse its discretion in declining Defendants' request to take judicial notice of the Receiver's testimony.[11]

And even if the testimony could be considered for its truth, Defendants would still not be entitled to immunity. In

---

[11] We also reject Defendants' argument that the Complaint's mention of the Receiver's testimony incorporated the full testimony into the Complaint by reference. *See Orellana v. Mayorkas*, 6 F.4th 1034, 1043 (9th Cir. 2021) (holding that the "mere mention" of a document "is insufficient to incorporate" its contents into a complaint (quoting *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018))).

his testimony before the California Senate, the Receiver suggested that he was involved in the decision to transfer inmates *out* of CIM, but he did not indicate that he directed Defendants to transfer inmates *to* San Quentin. The testimony also does not suggest that the Receiver directed Defendants' post-transfer protocols.

This case is therefore unlike *Hines v. Youseff*, 914 F.3d 1218 (9th Cir. 2019), or *Rico v. Ducart*, 980 F.3d 1292 (9th Cir. 2020), on which Defendants rely. In both of those cases, the plaintiffs' claims arose from actions state officials took while following the express orders of a federal receiver or an overseeing district court. *See Hines*, 914 F.3d at 1225, 1231; *Rico*, 980 F.3d at 1299–300. Even if we were to consider the Receiver's testimony alongside the Complaint, that is not what the allegations and testimony suggest happened here.

**2.**

Defendants next invoke a statute that they argue would have led reasonable prison officials to believe that they could handle the COVID-19 outbreak however they saw fit, without a risk of liability. We reject that argument because the statute does not affect the scope or clarity of the underlying constitutional right, which is all that qualified immunity considers.

The Public Readiness and Emergency Preparedness ("PREP") Act, 42 U.S.C. § 247d-6d, "provides immunity from federal and state law claims relating to the administration of certain medical countermeasures during a declared public health emergency." *Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 138 (D.C. Cir. 2022). Congress passed the Act in 2005 to encourage during times of crisis the "development and deployment of medical

countermeasures" (such as diagnostics, treatments, and vaccines) by limiting legal liability relating to their administration. *Id.* at 139 (citation omitted).

The district court held that the PREP Act does not confer immunity here, and Defendants did not appeal (and do not attempt to dispute here) that aspect of the district court's order. But Defendants nonetheless assert that they are entitled to qualified immunity because of the Act's existence, which Defendants argue would have led a reasonable officer to believe that he would be immune from liability for any actions even arguably within the Act's scope.

Defendants' argument conflates the existence of a constitutional right with the availability of a remedy for a violation of that right. Qualified immunity turns on the existence and clarity of the underlying right; an officer is entitled to constitutional immunity from a civil damages suit only if his conduct "does not violate clearly established statutory or constitutional *rights* of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The PREP Act, however, limits remedies, not rights. *See* 42 U.S.C. § 247d-6d(a)(1) (providing that "a covered person *shall be immune from suit and liability* under Federal and State law" with respect to certain claims (emphasis added)). The statute does not (and could not) narrow the scope of a person's constitutional rights; rather, it limits an injured person's ability to secure a remedy in some circumstances.

## 3.

Lastly, Defendants urge us to consider the policy consequences of permitting this lawsuit to proceed. They

warn that allowing Plaintiffs to further pursue their due process claims will cause officials to "delay or abandon necessary inmate healthcare decisions" in the future. But the qualified immunity inquiry already takes policy concerns of that sort into account. *See Harlow*, 457 U.S. at 814 (describing qualified immunity as the "best attainable accommodation of [the] competing values" of permitting "vindication of constitutional guarantees" on the one hand and avoiding "social costs," such as "the diversion of official energy from pressing public issues," on the other). It is not for us to upset the careful balance that the Supreme Court has struck in crafting qualified immunity doctrine.[12]

## IV.

For the foregoing reasons, we **AFFIRM**.

---

[12] Plaintiffs also allege that Defendants violated their due process right to familial association with Polanco. On appeal, Defendants respond by arguing only that the familial association claims are "derivative" of the state-created-danger claim asserted on Polanco's behalf and that they are therefore entitled to qualified immunity on all claims for the same reasons. Defendants have accordingly forfeited any other argument that they are entitled to qualified immunity on the familial association claims. *See AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012) (holding that a party forfeited an argument by failing to "'specifically and distinctly' argue the issue in his opening brief" (quoting *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992))). We therefore affirm the district court's denial of qualified immunity with respect to the familial association claims as well.

R. NELSON, dissenting:

Because the law is not clearly established, I conclude that the Defendants are entitled to qualified immunity. As such, I would reverse and therefore dissent.[1]

I

The conduct at issue begins in the earliest days of the COVID-19 pandemic. In May 2020, the science on the virus was far from settled, including best practices for combatting the virus. Prison officials at San Quentin State Prison and the California Department of Corrections and Rehabilitation faced a difficult task—managing prison affairs amid global chaos.

If Defendants here tried to do their best, it is safe to say that they either failed or need to reassess. The facts alleged are troubling and tragic. These allegations, which must be taken as true at this stage, are sufficient for a negligence claim—perhaps even gross negligence. But mere negligence does not establish a violation of the Constitution. *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1122 (9th Cir. 2021). Even if the complaint alleges a constitutional violation, as the majority holds, it is not one that was clearly established at the time—a time which, it bears repeating, was during one of the most novel and disruptive pandemics in a century.

---

[1] Because I find that the law is not clearly established here, I would not analyze the underlying constitutional violation. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Hindsight is 20/20, and we cannot view the clearly established inquiry through the lens of what we know or believe to be true now. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). The COVID-19 pandemic was unprecedented. Therefore, to say that the law was clearly established in my view disregards the exacting legal standard to overcome a qualified immunity defense.

The standard for clearly established law is "demanding" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be so clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). And "[a] rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson*, 483 U.S. at 641).

The Supreme Court has repeatedly told the Ninth Circuit in particular "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)); *see also Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8–9 (2021) (per curiam); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503–04 (2019) (per curiam); *al-Kidd*, 563 U.S. at 742; *Brosseau v. Haugen*, 543 U.S. 194, 197–201 (2004) (per curiam). This

is because "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742).

As is not uncommon in our circuit, the majority regrettably fails to heed this guidance. Making matters worse, in employing the high level of generality that the Supreme Court has chastised us for, the majority concludes that clearly established means "close enough." That is not the law.

## II

The majority identifies two cases that, in its view, clearly establish the constitutional violation: (1) *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), and (2) *Pauluk v. Savage*, 836 F.3d 1117 (9th Cir. 2016). Maj. at 19–20. Both cases fail to meet the high burden that the Supreme Court requires.

The majority claims that *Grubbs* "presents a close analogy to this case." Maj. at 20. But "close," by definition, fails to satisfy the standard for clearly established. In *Grubbs*, a nurse was hired to work in an institution's medical clinic and was specifically led to believe that she would not have to work alone with violent sex offenders. 974 F.2d at 120. She was then attacked when she was left alone with a known violent sex offender who had failed all treatment programs at the institution and who "was considered very likely to commit a violent crime if placed alone with a female." *Id.* Unfortunately, the offender assaulted, battered, kidnapped, and raped the nurse. *See id.*

The facts of *Grubbs* deeply contrast with those here too much to clearly establish the law. The majority suggests that because "there, as here, the employee worked in a

correctional institution and was harmed in the process of carrying out her job duties," Maj. at 20, that this supports a finding of clearly established law. But this falls directly into the "too high of a level of generality" conundrum that we have repeatedly been warned against applying. *See al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (cleaned up)). Working in the same type of facility and suffering harm as an employee cannot place everything unconstitutional "beyond debate." *See id.* at 741. Such a holding would strip the clearly established standard of all its teeth.

The majority all but concedes that the clearly established standard cannot be met. As it recognizes, "there are also differences; the danger in *Grubbs* stemmed from a violent inmate, whereas Polanco was harmed by a disease that he contracted at his workplace." Maj. at 20. The majority explains why *Grubbs* cannot clearly establish the law here. For a facility to directly place a violent person alone with an employee does nothing to clearly establish the law for the constitutional standards of an invisible, non-human, and novel global virus wafting through the air. Respectfully, there is no question that the conduct at issue in *Grubbs* fails to have put the officials here "on notice" that their behavior relating to their response to COVID-19 was unconstitutional. *See*, *e.g.*, *Wesby*, 138 S. Ct. at 589.

The majority seemingly agrees: "[i]f *Grubbs* were the only relevant precedent, whether Polanco's due process right was clearly established might be a close question." Maj. at 20. But the majority then asserts that the law is clearly established because "*Grubbs* does not stand alone," and relies on *Pauluk*, 836 F.3d 1117, as well.

But *Pauluk* is not dispositive either. There, an employee died from complications from toxic mold in his workplace. *Id.* at 1119; Maj. 20-21. But again, the differences here are distinguishable enough that they cannot support a holding of clearly established law.

To begin, the law was not previously established before *Pauluk*. *Id.* at 1121 (granting qualified immunity because it found the law was not clearly established). And even though the *Pauluk* court noted that the danger at issue was due to physical conditions in the workplace, *id.* at 1119, this still cannot have put the officers on notice that their conduct in handling COVID-19 would be unconstitutional. The state-created danger in *Pauluk* was both open and notorious: There was a years-long history of mold; Pauluk repeatedly reported the presence of mold in the building and near his office desk; and Pauluk was exposed to said mold for over five years before the decline of his health and eventual passing. *See id.* Pauluk also repeatedly requested a transfer to a new workplace because of the mold but was denied by his superiors, who were fully aware of the mold infestation. *See id.* Therefore, the officials in *Pauluk* were not only aware the danger existed, but they also fully understood the risks of mold exposure and refused to remedy the problem or permit Pauluk to remedy it himself by transferring workplaces for years. *See id.*

None of that exists here. *Pauluk*, like *Grubbs*, contrasts with the rapidly evolving nature of COVID-19. During the initial months of the pandemic, guidance was uncertain, developing, and consistently changing.[2] The same cannot be

---

[2] The majority counters that Plaintiffs' have alleged that Defendants knew of, and consciously disregarded, the risk that COVID-19 posed to

said about toxic mold.  The exposure of COVID-19 alleged here did not persist over a matter of years in which the subject brought the danger to the attention of any official, let alone Defendants.  Even if the complaint alleges that Defendants knew or should have appreciated the risks to Polanco, there is no allegation that Polanco raised the official's COVID-19 response as an issue or requested a transfer.  Rather than request transfer or reassignment, Polanco volunteered to take on more shifts.  The facts as alleged also do not indicate that Polanco was prohibited from taking any COVID-19 precautions he saw fit, such as

---

San Quentin employees.  Maj. at 22 n.9.  But this is not dispositive.  We have held that "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high." *Sandoval v. County of San Diego*, 985 F.3d 657, 672 (9th Cir. 2021), *cert. denied sub nom. San Diego County v. Sandoval*, 142 S. Ct. 711 (2021) (cleaned up).  Thus, the 'dispositive inquiry in the clearly established analysis is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, based on the law at the time." *Id.*  Even accepting the allegation that Defendants knew about the risks of COVID-19 does not change the novelty of the pandemic—or that *Pauluk* and *Grubbs* do not clearly establish the law based on the facts alleged by plaintiffs.

That Defendants may be entitled to qualified immunity on summary judgment, Maj. at 22 n.9, is cold comfort.  The "'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials [will] be resolved prior to discovery." *Pearson*, 555 U.S. at 231 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987) (cleaned up)).  Accordingly, the Supreme Court has repeatedly stressed the "importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

wearing a mask or bringing in his own personal protective equipment.  These are meaningful distinctions from *Pauluk*.

The majority concludes that the differences between toxic mold and COVID-19 are a distinction without a difference.  Maj. at 21-22.  I disagree.  COVID-19 presented prison officials with a rapidly emerging and evolving challenge that is simply different in kind from the problems facing employers receiving continuing complaints over years about mold.  This does not satisfy the high threshold the court's caselaw commands for law to be clearly established.[3]

The majority cites no other case law that would clearly establish the law here.  Instead, the majority combines what it perceives to be the most compelling attributes of *Grubbs* and *Pauluk* together to show that the law is clearly established.[4]  But this mishmash of those cases still examines the law at too high of a level of generality.  Denial of qualified immunity requires a factual case on point, even if not perfect, that places the Defendants on notice that their conduct was unconstitutional beyond debate.  *al-Kidd*, 563 U.S. at 741.  It is therefore no answer to say that "COVID-19 may have been unprecedented, but the legal theory that

---

[3] The majority relies on our decision in *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012), for the proposition that "[a]n officer is not entitled to qualified immunity on the ground that the law is not clearly established every time a novel method is used to inflict injury."  Maj. at 22 n.8 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)).  Even so, our case law must clearly establish the constitutional violation.  Here, no such law exists.

[4] Even combined, Maj. at 20 n.8, *Grubbs* and *Pauluk* do not establish the law.  Indeed, *Grubbs* can hardly add much when *Pauluk* held that the law was not clearly established in 2016.  And *Pauluk* does not clearly establish the law here with sufficient specificity.

Plaintiffs assert is not." Maj. at 22. That holding is far more dangerous to our future precedent, as it disregards the clearly established inquiry we must assess here. And a shared legal theory does not clearly establish the law because it "does not necessarily follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (quoting *Anderson*, 483 U.S. at 641). This reflects the same logical flaw as the discussion of *Grubbs*: some similarity is not enough.

It is also telling that plaintiffs cite no other binding authority that clearly establishes the law beyond *Grubbs* and *Pauluk*. I would thus also find that plaintiffs have not met their burden of proof to foreclose qualified immunity. *See, e.g.*, *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct."); *see also Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). To show a clearly established right, plaintiffs must demonstrate the right was clear "in light of the specific context of the case, not as a broad general proposition." *Keates v. Koile*, 883 F.3d 1228, 1239 (9th Cir. 2018) (quoting *Mullenix*, 577 U.S. at 12). In the specific context of this case, they have not done so.

## III

No clearly established law placed the Defendants on notice that their alleged mismanagement of the COVID-19 pandemic at San Quentin prison was unconstitutional such that every "reasonable official would [have understood] that what he is doing violates that right." *al-Kidd*, 563 U.S. at 742 (citation omitted). As such, Defendants are properly

entitled to qualified immunity.  I would reverse and therefore respectfully dissent.