**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL HAMPTON;
JACQUELINE HAMPTON,
　　　　　*Plaintiffs-Appellees,*

　v.

STATE OF CALIFORNIA;
CALIFORNIA DEPARTMENT OF
CORRECTIONS AND
REHABILITATION; SAN QUENTIN
STATE PRISON; RALPH DIAZ;
RONALD DAVIS, Warden;
RONALD BROOMFIELD;
CLARENCE CRYER; ALISON
PACHYNSKI; SHANNON
GARRIGAN; LOUIE ESCOBELL;
MUHAMMAD FAROOQ; KIRK A
TORRES; ESTATE OF ROBERT S.
THARRATT,
　　　　　*Defendants-Appellants.*

No. 22-15481

D.C. No.
3:21-cv-03058-LB

OPINION

Appeal from the United States District Court
for the Northern District of California
Laurel D. Beeler, Magistrate Judge, Presiding

Argued and Submitted May 10, 2023
San Francisco, California

Filed October 3, 2023

Before:  Michelle T. Friedland and Mark J. Bennett, Circuit Judges, and Richard D. Bennett,[*] District Judge.

Opinion by Judge Friedland

## SUMMARY[**]

### Prisoner Civil Rights/COVID-19

On interlocutory appeal, the panel (1) affirmed in part and reversed in part the district court's order denying defendants' motion to dismiss on the basis of immunity under the Public Readiness and Emergency Preparedness Act ("PREP Act") and qualified immunity in an action brought against California prison officials arising from the death of a San Quentin inmate from COVID-19; and (2) dismissed for lack of jurisdiction defendants' claims asserting immunity under state law.

On May 30, 2020, defendants transferred 122 inmates from the California Institution for Men, which had suffered a severe COVID-19 outbreak, to San Quentin Prison, where there were no known cases of the virus, resulting in an

---

[*] The Honorable Richard D. Bennett, United States Senior District Judge for the District of Maryland, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

outbreak that killed one prison guard and over twenty-five inmates, including plaintiff's husband, Michael Hampton.

Determining that the denial of PREP Act immunity was an appealable collateral order, the panel held that defendants were not, on the face of the complaint, entitled to immunity under the PREP Act, which limits legal liability for the administration of medical countermeasures (such as diagnostics, treatments, and vaccines) during times of crisis. The panel held that the PREP Act does not provide immunity against claims arising from the failure to administer a covered countermeasure. Here, plaintiff alleged that defendants were aware prior to the inmates' transfer that their COVID-19 test results were so outdated as to be essentially irrelevant. It therefore was plausible to infer that the testing results did not contribute to the decision to transfer the inmates—and, accordingly, did not contribute to Hampton's death. Once post-transfer testing occurred, the damage had been done. Because the allegations did not describe a causal relationship between the administration of testing and Hampton's death, plaintiff's claims were not precluded by the PREP Act.

The panel held that defendants were not entitled to qualified immunity on plaintiff's Eighth Amendment claim, which adequately alleged that defendants acted with deliberate indifference to the health and safety of San Quentin inmates, including Hampton. The right at issue— to be free from exposure to a serious disease—was clearly established since at least 1993, when the Supreme Court decided *Helling v. McKinney*, 509 U.S. 25 (1993), and under this circuit's precedent. All reasonable prison officials would have been on notice in 2020 that they could be held liable for exposing inmates to a serious disease, including a serious communicable disease.

Finally, the panel held that it lacked jurisdiction to consider whether officials were entitled to immunity under state law. Because the state law immunities on which defendants relied were immunities from liability, not from suit, defendants could not invoke the collateral order doctrine to immediately appeal the district court's rejection of those state law defenses.

In an accompanying memorandum disposition, the panel reversed the district court's denial of qualified immunity on plaintiff's due process claim for violation of her own right to familial association with Hampton.

---

**COUNSEL**

Cassandra J. Shryock (argued) and Robert M. Perkins III, Deputy Attorneys General; Jeffrey T. Fisher, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Francisco, California; for Defendants-Appellants.

Michael J. Haddad (argued), Julia Sherwin, and Teresa Allen, Haddad & Sherwin LLP, Oakland, California; Brian Hawkinson, Liebert Cassidy Whitmore, San Francisco, California; for Plaintiffs-Appellees.

Adam R. Pulver, Allison M. Zieve, and Scott L. Nelson, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen.

# OPINION

FRIEDLAND, Circuit Judge:

Early in the COVID-19 pandemic, the California Institution for Men ("CIM") suffered a severe COVID-19 outbreak. In an attempt to protect CIM inmates, high-level officials in the California prison system transferred 122 inmates from CIM to San Quentin State Prison, where there were no known cases of the virus. The transfer sparked an outbreak of COVID-19 at San Quentin that infected over two-thousand inmates and ultimately killed over twenty-five inmates and one prison guard.

The wife of one of the deceased inmates sued, claiming that the prison officials had violated her husband's constitutional and statutory rights. The officials moved to dismiss, asserting that the claims were barred by various federal and state immunities, including immunity under the Public Readiness and Emergency Preparedness Act and qualified immunity. The district court held that the officials were not entitled to immunity at this stage of the proceedings, and the officials filed this interlocutory appeal. We affirm the district court's conclusion that the officials are not entitled to immunity under federal law for the claimed violations of her husband's rights,[1] and we lack jurisdiction to consider whether the officials are entitled to immunity under state law.

---

[1] Plaintiff also asserted a due process claim for violation of her own right to familial association with Hampton. In a memorandum disposition accompanying this opinion, we reverse the district court's decision to deny qualified immunity on that claim.

## I.

We recently considered an appeal arising out of virtually identical allegations, but in a case alleging a violation of the deceased prison guard's due process rights. *See Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023). We redescribe the allegations here, taking all of them as true at this stage of the proceedings. *See Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012).

## A.

On March 4, 2020, California Governor Gavin Newsom proclaimed a state of emergency due to COVID-19. The declaration was quickly followed by other emergency measures at the state and local levels, including shelter-in-place orders and mask mandates. Later that month, Governor Newsom issued an executive order suspending the intake of inmates into all state correctional facilities. Around the same time, California Correctional Health Care Services adopted a policy opposing the transfer of inmates between prisons, reasoning that transfers could "carr[y] [a] significant risk of spreading transmission of the disease between institutions."

Defendants—a group of high-level officials at CIM, San Quentin, and the California Department of Corrections and Rehabilitation ("CDCR")—were aware of the risks that COVID-19 posed in a prison setting. All had been briefed on the dangers of COVID-19, the highly transmissible nature of the disease, and the necessity of taking precautions (such as social distancing, mask-wearing, and testing) to prevent its spread. Defendants were also aware that containing an outbreak at San Quentin would be particularly difficult due to its tight quarters, antiquated design, and poor ventilation. As of late May 2020, though, San Quentin appeared to be

weathering the storm with no known cases of COVID-19. Other prisons were not so fortunate. CIM suffered a severe outbreak, which by late May had killed at least nine inmates and infected over six hundred.

In an attempt to prevent further harm to CIM inmates, on May 30, Defendants transferred 122 CIM inmates with high-risk medical conditions to San Quentin. The transfer did not go well. Most of the men who were transferred had not been tested for COVID-19 for over three weeks, and none of the transferred inmates were properly screened for symptoms before being "packed" onto buses to San Quentin "in numbers far exceeding" the COVID-capacity limits that CDCR had established for inmate safety. Although some inmates began experiencing symptoms while on the buses, the buses did not turn back. And instead of quarantining the inmates upon their arrival at San Quentin, Defendants placed them in a housing unit with grated doors (allowing air to flow in and out of the cells) and had them use the same showers and eat in the same mess hall as other inmates.

Two days later, the Marin County Public Health Officer learned of the transfer and scheduled an immediate conference call with some Defendants. On the call, he recommended that the transferred inmates be completely sequestered from the original San Quentin population, that all exposed inmates and staff be required to wear masks, and that staff movement be restricted between different housing units to prevent the spread of COVID-19. Despite being timely informed of the Public Health Officer's recommendations, Defendants did not heed his advice. Rather, they ordered that the Public Health Officer be informed that he lacked the authority to mandate measures in a state-run prison.

COVID-19 soon began to sweep through San Quentin. Within days of the transfer, twenty-five of the transferred inmates had tested positive.  Over a three-week period, San Quentin went from zero confirmed cases of COVID-19 to nearly five hundred.

In mid-June, a court-appointed medical monitor of California prisons (the "Receiver")[2] requested that a group of health experts investigate the outbreak at San Quentin. The health experts wrote an "urgent memo" warning that the COVID-19 outbreak at San Quentin could escalate into a "full-blown local epidemic and health care crisis in the prison and surrounding communities" if not contained.  The memo criticized many practices at San Quentin, noting, for instance, that personal protective equipment and masks were not provided to staff or inmates.  Even when inmates and staff had masks, many wore them improperly or failed to wear them at all.  The prison's testing protocol, too, was inadequate, suffering from what the memo considered "completely unacceptable" delays.  The memo also warned that quarantining inmates with COVID-19 in cells usually used for punishment could backfire by making inmates reluctant to report their symptoms.

Defendants were informed of the memo but did not adopt its recommendations.  For one, Defendants placed sick inmates in solitary confinement, which discouraged inmates from reporting their symptoms—just as the experts had

---

[2] "In response to a class action, the United States District Court for the Northern District of California held in 2005 that the medical services in California prisons failed to meet the constitutional minimum. It accordingly appointed a receiver tasked with establishing a constitutionally adequate medical system." *Polanco*, 76 F.4th at 924 n.2 (citation omitted); *see Plata v. Schwarzenegger*, No. C01-1351, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005).

warned would occur. Prison staff were not regularly tested for COVID-19 or trained on COVID-19 safety protocols. And when two research labs offered to provide COVID-19 testing at the prison, Defendants refused the offers, even though one lab offered the testing for free.

The outbreak continued to spread. By July, more than 1,300 inmates had tested positive. In August, the infection count exceeded 2,000—approximately two-thirds of the San Quentin inmate population. By early September, twenty-six inmates and one correctional officer had died of COVID-19.

**B.**

At the time of the transfer, Michael Hampton was a sixty-two-year-old inmate at San Quentin. Hampton had multiple health conditions, including obesity, hypertension, and pre-diabetes, that put him at high risk of death if he were to contract COVID-19. In early June, he started experiencing symptoms consistent with COVID-19, including a persistent cough. His condition worsened, and he was transferred to the hospital in late June.

At the hospital, Hampton was diagnosed with "COVID-19 pneumonia." He was placed on a ventilator in early August. In mid-September, he was moved to "comfort care." He died on September 25, 2020.

**C.**

Hampton's wife ("Plaintiff") initiated this lawsuit in the United States District Court for the Northern District of California, asserting an Eighth Amendment claim under 42 U.S.C. § 1983 as Hampton's successor in interest, as well as various federal and state statutory claims and a state law negligence claim. Defendants moved to dismiss for failure to state a claim, asserting that all of Plaintiff's claims were

barred by Public Readiness and Emergency Preparedness Act immunity. In the alternative, Defendants argued that they were entitled to qualified immunity on Plaintiff's Eighth Amendment claim and that Plaintiff's state law claims were barred by various state law immunities. The district court rejected all of Defendants' claims to immunity. Defendants timely appealed.

## II.

"We review de novo a district court's decision to deny a motion to dismiss under Rule 12(b)(6)." *Dunn v. Castro*, 621 F.3d 1196, 1198 (9th Cir. 2010). When engaging in such review, we "accept[] as true all well-pleaded allegations" and "construe[] them in the light most favorable to the non-moving party." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Padilla v. Yoo*, 678 F.3d 748, 757 (9th Cir. 2012)).

## III.

Defendants assert that all of Plaintiff's claims are barred by the Public Readiness and Emergency Preparedness ("PREP") Act, 42 U.S.C. § 247d-6d, which "provides immunity from federal and state law claims relating to the administration of certain medical countermeasures during a declared public health emergency." *Polanco v. Diaz*, 76 F.4th 918, 932 (9th Cir. 2023) (quoting *Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 138 (D.C. Cir. 2022)). Defendants argue that Plaintiff's claims relate to the administration of COVID-19 tests and that we should therefore reverse the district court's conclusion that the PREP Act does not confer immunity.

**A.**

Before we can turn to the merits of Defendants' argument, we must determine whether, under the collateral order doctrine, we can consider an immediate appeal of the denial of immunity under the PREP Act, or whether such an appeal must await final judgment. "Federal circuit courts have jurisdiction over appeals from 'final decisions' of district courts." *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 859 F.3d 720, 723 (9th Cir. 2017) (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 103 (2009)). "Although 'final decisions' typically are ones that trigger the entry of judgment, they also include a small set of prejudgment orders that are 'collateral to' the merits of an action and 'too important' to be denied immediate review." *Mohawk Indus., Inc.*, 558 U.S. at 103 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). "That small category includes only decisions" that (1) "are conclusive," (2) "resolve important questions separate from the merits," and (3) "are effectively unreviewable on appeal from the final judgment in the underlying action." *Id.* at 106 (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). Denials of Eleventh Amendment immunity, absolute immunity, qualified immunity, foreign sovereign immunity, and tribal sovereign immunity all satisfy these criteria and thus are immediately appealable. *See SolarCity Corp.*, 859 F.3d at 725.

A denial of PREP Act immunity also satisfies the collateral order doctrine's requirements. First, denial of PREP Act immunity is conclusive because the PREP Act confers complete immunity from suit. *See* 42 U.S.C. § 247d-6d(a)(1) ("[A] covered person shall be *immune from suit and liability*[.]" (emphasis added)). An order denying PREP Act immunity thus "purport[s] to be [a] conclusive

determination[]" that Defendants "have no right not to be sued." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145 (1993). Second, a denial of PREP Act immunity resolves an important question separate from the merits. Whether PREP Act immunity applies turns on whether the claim for which immunity is asserted relates to the defendant's use of certain medical countermeasures, a determination that "generally will have no bearing on the merits of the underlying action." *Id.* And we defer to Congress's judgment that such a determination is "too important to be denied review." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quoting *Cohen*, 337 U.S. at 546); *see also Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994) ("When a policy is embodied in a constitutional or statutory provision entitling a party to immunity from suit (a rare form of protection), there is little room for the judiciary to gainsay its 'importance.'"). Third and finally, as an immunity from suit, the benefit of PREP Act immunity "is effectively lost" if a party is erroneously required to "face the . . . burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Because a denial of PREP Act immunity is an appealable collateral order, we have jurisdiction to consider the merits of Defendants' argument that Plaintiff's claims fall within the Act's scope.

### B.

Defendants are not entitled to immunity under the PREP Act on the face of the Complaint.

### 1.

"Congress passed the [PREP] Act in 2005 to encourage during times of crisis the 'development and deployment of

medical countermeasures' (such as diagnostics, treatments, and vaccines) by limiting legal liability relating to their administration." *Polanco*, 76 F.4th at 932 (quoting *Cannon*, 45 F.4th at 139). The statute offers "covered person[s]" immunity "from suit and liability" for claims "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1). That immunity "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." § 247d-6d(a)(2)(B).

The Act's immunity lies dormant until the Secretary of Health and Human Services "makes a determination that a disease . . . constitutes a public health emergency" and "make[s] a declaration, through publication in the Federal Register," that the Act's immunity "is in effect." § 247d-6d(b)(1). On March 17, 2020, the Secretary did just that, declaring that COVID-19 "constitutes a public health emergency" and that "immunity as prescribed in the PREP Act" was "in effect" for the "manufacture, testing, development, distribution, administration, and use of" covered countermeasures. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198, 15201 (Mar. 17, 2020). The Secretary went on to define "covered countermeasures" about as broadly as the Act permits, encompassing "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19." *Id.* at 15202; *see* § 247d-6d(i)(1).

**2.**

Plaintiff does not dispute that Defendants are "covered person[s]" under the Act. And all agree that COVID tests are "covered countermeasures." Whether Defendants are immune under the PREP Act thus turns on whether Plaintiff's claims are for loss "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." § 247d-6d(a)(1).

Defendants first argue that Plaintiff's claims meet that standard because Plaintiff alleges that Hampton's death was caused (at least in part) by Defendants' failure to administer COVID tests to CIM inmates in the days prior to the inmates' transfer to San Quentin. But the PREP Act provides immunity only from claims that relate to "the administration to or the use by an individual of" a covered countermeasure—not such a measure's *non*-administration or *non*-use. *Id*. This reading is reinforced by other sections of the Act, which continually refer to that underlying "administration" or "use" of a countermeasure. For example, under the Act, immunity applies "only if" a few conditions are met: The countermeasure must have been "administered or used during the effective period of the declaration," and the use must have been "for the category . . . of diseases . . . specified in the [Secretary's] declaration." § 247d-6d(a)(3)(A), (B). Those conditions cannot be satisfied if no countermeasure was administered or used.

Defendants invoke an advisory opinion prepared by the Department of Health and Human Services, which they argue provides support for the position that the Act covers claims arising out of a failure to administer a covered

countermeasure. *See* Dep't of Health & Human Servs., Advisory Opinion 21-01 on the Public Readiness and Emergency Preparedness Act Scope of Preemption Provision (Jan. 8, 2021), https://perma.cc/5K3Y-A9JQ. But the advisory opinion is irrelevant to this case. The advisory opinion relies on the following hypothetical:

> [C]onsider a situation where there is only one dose of a COVID-19 vaccine, and a person in a vulnerable population and a person in a less vulnerable population both request it from a healthcare professional. In that situation, the healthcare professional administers the one dose to the person who is more vulnerable to COVID-19. In that circumstance, the failure to administer the COVID-19 vaccine to the person in a less-vulnerable population "relat[es] to . . . the administration to" the person in a vulnerable population.

*Id.* at 3 (footnote omitted) (second alteration in original). This hypothetical illustrates the fact that, for a countermeasure with limited availability, administering the countermeasure to one person could mean withholding it from another. But that is not what Plaintiff alleges happened here. The Complaint nowhere suggests (and Defendants do not argue) that tests were in short supply and that Defendants saved the limited tests for others. Rather, the Complaint suggests the opposite: Prior to the transfer, Defendants rejected a lab's offer to provide free COVID-19 testing at San Quentin.

Defendants argue in the alternative that Plaintiff's claims do, in fact, "relate to" the use or administration of a covered

countermeasure—namely, the decision to test the transferred inmates twice, once roughly three weeks prior to the transfer, and again after the transfer.  We cannot accept that argument at the pleading stage either.

Although the PREP Act's immunity encompasses claims for loss "relating to" the administration of a countermeasure, the Supreme Court has "singled out" the term "relate to" as "particularly sensitive to context."  *Dubin v. United States*, 143 S. Ct. 1557, 1565-66 (2023).  The Court has explained that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere."  *Id.* at 1566 (cleaned up) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).  "That the phrase refers to a relationship or nexus of some kind is clear . . . . Yet the kind of relationship required, its nature and strength, will be informed by context."  *Id.*

Considered in its context in the PREP Act, "relating to" takes on a more targeted meaning.  *See McDonnell v. United States*, 579 U.S. 550, 568-69 (2016) ("[A] word is known by the company it keeps." (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961))).  The surrounding verbal phrases—"caused by," "arising out of," and "resulting from," § 247d-6d(a)(1)—all connote some type of causal relationship.  At the very least, then, for PREP Act immunity to apply, the underlying use or administration of a covered countermeasure must have played some role in bringing about or contributing to the plaintiff's injury.[3]  It is not

---

[3] Under the canon against surplusage, we do our best, "if possible, to give effect to each word and clause in a statute."  *United States v. Lopez*, 998

enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense.

As described in the Complaint, the testing that took place did not play a role in bringing about or contributing to Hampton's death. Beginning with the testing that occurred prior to the transfer, Plaintiff alleges that Defendants were aware that the test results they had were so outdated as to be essentially irrelevant. If Defendants were willing to transfer inmates with such outdated results, it is plausible to infer that the existence of those results did not contribute to the decision to transfer the inmates—and, accordingly, did not contribute to Hampton's death. And by the time the transferred inmates were tested upon their arrival at San Quentin, the damage had been done. Plaintiff alleges that when the post-transfer results came back, many of the transferred inmates who tested positive had already been housed in the same unit as the other transferred inmates and had been using the same showers and mess hall as non-transferred inmates for at least six days. Because the allegations do not describe a causal relationship between the

---

F.3d 431, 440 (9th Cir. 2021). But that canon "assists only where a competing interpretation gives effect to every clause and word of a statute." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011)). No such competing interpretation could be adopted here; there is hardly any daylight, for example, between the phrases "caused by" and "resulting from." § 247d-6d(a)(1). "In light of this redundancy, we are not overly concerned" that interpreting "relates to" as requiring some type of causal relationship "may be redundant as well." *Marx*, 568 U.S. at 385.

administration of either of the tests and Hampton's death, Plaintiff's claims are not precluded by the PREP Act.[4]

## IV.

We next consider whether Defendants are entitled to qualified immunity on Plaintiff's Eighth Amendment claim.[5] We hold that they are not.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To be entitled to qualified immunity at the motion to dismiss stage, an officer must show that the allegations in the complaint do not make out a violation of a constitutional right or that any such right was not clearly established at the time of the alleged misconduct.  *See Pearson*, 555 U.S. at 232-36.  "[D]ismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies."  *Polanco*

---

[4]  Defendants suggest that we should consider the pre- and post-transfer tests as a single plan when deciding whether Plaintiff's claims fall within the scope of the PREP Act.  But even if evaluating the testing collectively could somehow help Defendants, the Complaint does not clarify when the decision to test post transfer was made.  From the face of the Complaint, we therefore cannot infer that Defendants intended from the start to test the inmates once before the transfer and once after—they may have instead decided to administer post-transfer tests only once staff noticed that some inmates exhibited symptoms consistent with COVID-19.

[5] As noted above, we have jurisdiction under the collateral order doctrine to review a district court's rejection of a qualified immunity defense at the motion to dismiss stage.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 671-72 (2009).

*v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016)).

## A.

We first hold that Plaintiff has alleged a violation of Hampton's Eighth Amendment rights.

The Eighth Amendment's prohibition against "cruel and unusual punishments" imposes duties on prison officials to provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).[6]  This duty stems from the relationship between the State and those in its custody. As the Supreme Court has explained:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses

---

[6] The cruel-and-unusual-punishments clause is incorporated against the states by the Due Process Clause of the Fourteenth Amendment.  *See McDonald v. City of Chicago*, 561 U.S. 742, 764 n.12 (2010) (citing *Robinson v. California*, 370 U.S. 660, 666 (1962)).

the substantive limits on state action set by the Eighth Amendment.

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (alterations in original) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)). Under the Eighth Amendment, then, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). The Amendment's protections extend to "condition[s] of confinement that [are] sure or very likely to cause serious illness and needless suffering" in the future. *Helling*, 509 U.S. at 33. For instance, the Supreme Court has held that involuntarily exposing an inmate to secondhand tobacco smoke by requiring him to bunk with a cellmate who smokes continuously can form the basis of an Eighth Amendment claim. *See id.* at 35. So too can exposing inmates to "infectious maladies" such as hepatitis. *See id.* at 33 (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

In such circumstances, it is a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate" that violates the Eighth Amendment. *Farmer*, 511 U.S. at 828. This type of Eighth Amendment claim has an objective component and a subjective component. An inmate must allege that the deprivation was, objectively, "sufficiently serious." *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The inmate must also allege that the defendant official acted, subjectively, with "deliberate indifference" to inmate health or safety. *Id.* (quoting *Wilson*, 501 U.S. at 302-03).

**1.**

The objective component of this claim requires a plaintiff to plausibly allege that it is "contrary to current standards of decency for anyone to be . . . exposed against his will" to the relevant hazard. *Helling*, 509 U.S. at 35. In other words, the resulting risk must not be one that "society chooses to tolerate." *Id.* at 36.

In *Hines v. Youseff*, 914 F.3d 1218 (9th Cir. 2019), we rejected an Eighth Amendment claim based on a risk that we held society *had* chosen to tolerate: Valley Fever. *Id.* at 1231. We noted that millions of people were voluntarily living and working in the Central Valley of California, even though doing so put them at a heightened risk of contracting Valley Fever from the presence of certain fungal spores there. *Id.* We also noted that there was "no evidence in the record that 'society's attitude had evolved to the point that involuntary exposure'" to Valley Fever "violated current standards of decency." *Id.* at 1232 (quoting *Helling*, 509 U.S. at 29).

The differences between society's responses to Valley Fever and to COVID-19 in the relevant time periods are plain. The Complaint describes the drastic steps that state and local governments took to prevent anyone from being involuntarily exposed to COVID-19, including shelter-in-place orders and mask mandates whose violations were punishable as misdemeanors. It also alleges that Marin County (where San Quentin is located) explained that the purpose of its shelter-in-place order was "to slow virus transmission as much as possible." Plaintiff has thus sufficiently alleged that a "societal consensus" had emerged by May 2020 that the risk of contracting COVID-19 was

"intolerably grave" such that involuntarily exposing inmates to the disease violated then-current standards of decency. *Id*.

**2.**

The subjective component of this Eighth Amendment claim requires a plaintiff to allege that officials "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. That is, the officials must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must have actually "draw[n] the inference." *Id.* Even so, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

In *Polanco*, we considered whether many of the same officials who are defendants here were deliberately indifferent toward the health and safety of a San Quentin employee. *See* 76 F.4th at 927-29. We held that the allegations in *Polanco* described a "textbook case of deliberate indifference: Defendants were repeatedly admonished by experts that their COVID-19 policies were inadequate, yet they chose to disregard those warnings." *Id.* at 929.[7]

*Polanco* controls here. Plaintiff's allegations regarding Defendants' mental states mirror nearly word-for-word the

---

[7] *Polanco* involved a claim under the state-created-danger doctrine, which is rooted in the Fourteenth Amendment. *See* 76 F.4th at 925-26. Such a claim requires the plaintiff to allege that the defendants acted with subjective deliberate indifference, *see id.* at 928 & n.7—the same mental state required here.

allegations in *Polanco*. And although we recognize two differences between this case and *Polanco*, neither changes our conclusion that the allegations describe deliberate indifference.

The first difference is about whose safety Defendants allegedly disregarded: Here, it is a San Quentin *inmate*, whereas in *Polanco* it was a San Quentin *employee*. This difference is immaterial. The fact that Defendants "did not take precautions to avoid transferring COVID-positive inmates to San Quentin or to decrease the likelihood that COVID-19 would spread" once the inmates arrived, *id.* at 928, shows a conscious disregard to the health and safety of San Quentin employees and inmates alike.

The second difference is that, although the complaints in both cases allege that prison officials failed to provide masks and other personal protective equipment to prison inmates and staff, only the *Polanco* complaint additionally alleges that masks and protective equipment were "easily obtainable." *Id.* at 929. The absence of that allegation here does not undermine Plaintiff's claim of deliberate indifference. If masks and personal protective equipment were not available, Defendants would have understood that it was particularly important to avoid transferring COVID-positive inmates to San Quentin, where the architecture would make difficult isolating inmates to prevent COVID's spread. The absence of masks also would have made even clearer the importance of properly testing and screening inmates prior to any transfer. On the other hand, if masks and protective equipment were available, the choice not to use them would reflect disregard for prisoner safety. Accordingly, whether masks were available or not, Plaintiff has plausibly alleged that Defendants acted with knowing disregard for the health and safety of San Quentin inmates.

Defendants contend that we should nonetheless conclude that they were not deliberately indifferent because a report prepared by California's Office of the Inspector General ("OIG Report" or "Report") shows that they took reasonable steps to mitigate the risks from the transfer. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); Office of the Inspector General, COVID-19 Review Series Part 3 (Feb. 2021) [hereinafter OIG Report], https://perma.cc/5W6G-27N3.  We disagree.[8]

The OIG Report was prepared at the request of the California Assembly and analyzes the "decision to transfer medically vulnerable incarcerated persons" from CIM to San Quentin.  OIG Report at i.  Although Defendants argue that the Report supports their position that they were not deliberately indifferent, the Report in fact strengthens Plaintiff's case.

The Report's description of the transfer is very similar to the allegations in the Complaint.  *See id.* at 1-5.  But the Report contains additional details that bolster Plaintiff's assertion that prison executives[9] were aware of, yet

---

[8] Defendants argue that the OIG Report was incorporated into the Complaint by reference.  Plaintiff does not object to our consideration of the Report.  Because we hold that Plaintiff prevails whether or not we consider the Report, we need not decide whether it was incorporated into the Complaint by reference.

[9] The OIG Report does not refer to prison executives by name, instead using generic titles such as "California Institution for Men Medical Executive" and "[California Correctional Health Care Services] Director."  OIG Report at 2.  We therefore cannot be sure that the executives referenced in the Report are among the named Defendants. Still, the Report bolsters Plaintiff's claim by showing that at least some prison executives were aware of the risks associated with the transfer.

consciously disregarded, the risks associated with the transfer. For instance, as documented in the Report, a CIM employee emailed a CDCR Manager three days before the transfer expressing concerns about the speed with which the transfer was taking place: "It's difficult to get things right when there is a rush. We have a lot to consider with this whole COVID issue. I'm surprised HQ wants to move our inmates right now. But we have to make sure we are not infecting another institution." *Id.* at 19. The email went on to draw from an experience in which CIM had moved 120 inmates from one part of the prison to another, noting that "many of those guys came up positive two weeks later," "contaminat[ing]" a new section of the prison. *Id.* And in response to the decision to place inmates on buses in numbers exceeding CDCR's COVID-capacity limits, a supervising nurse asked a prison executive: "What about Patient safety? What about COVID precautions?" *Id.* at 20.

Other emails documented in the OIG Report demonstrate that prison staff were aware that soon-to-be-transferred inmates' test results were dangerously out of date. Just days before the transfer, a supervising nurse at CIM emailed a CIM medical executive alerting the executive to the fact that some of the inmates set to be transferred had not been tested for COVID-19 for nearly a month. The nurse asked if the inmates would be "re-swabb[ed]" before the transfer. *Id.* at 21. Eleven minutes later, the medical executive responded with an email that said only: "No reswab[b]ing." *Id.* Another nurse emailed an executive cautioning that "the risk of transferring patients tested almost one month ago is high for poss[ible] covid spread" and that they should "slow down a little and do it right." *Id.*

Such details in the OIG Report reinforce Plaintiff's allegations by showing how prison executives brushed away

repeated warnings that they were proceeding in an unsafe manner. Whether or not we consider the Report, Plaintiff has adequately alleged that Defendants acted with deliberate indifference toward the health and safety of San Quentin inmates, including Hampton.

**B.**

The Eighth Amendment right at issue here was also "clearly established at the time of the violation." *Stewart v. Aranas*, 32 F.4th 1192, 1195 (9th Cir. 2022).

For the unlawfulness of an officer's conduct to be "clearly established," it must be true that, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted). The Supreme Court has emphasized that determining whether the law was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). For this reason, "it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate." *Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050-51 (9th Cir. 2002). To be clearly established, the relevant right must have been defined more narrowly.

Still, applying this doctrine here, Plaintiff is not required to point to a prior case holding that prison officials can violate the Eighth Amendment by transferring inmates from one prison to another during a global pandemic. Binding caselaw "need not catalogue every way in which" prison

conditions can be constitutionally inadequate "for us to conclude that a reasonable official would understand that his actions violated" an inmate's rights. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (en banc). Rather, "a right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (alteration in original) (quoting *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003)).

*Castro* serves as a useful guide for articulating the right at issue here at the proper level of generality. There, an inmate asserted an Eighth Amendment claim after being severely beaten by his cellmate. Sitting en banc, we described the "contours" of the relevant Eighth Amendment right in that case as the inmate's "right to be free from violence at the hands of other inmates." *Id.* Articulated at that same level of generality, the right at issue here is an inmate's right to be free from exposure to a serious disease. That right has been clearly established since at least 1993, when the Supreme Court decided *Helling v. McKinney*, 509 U.S. 25 (1993).

In *Helling*, an inmate alleged that he was assigned a cellmate who smoked five packs of cigarettes a day, exposing the inmate to dangerous chemicals and the risk of future health problems. *Id.* at 28. The Supreme Court held that the inmate had stated an Eighth Amendment claim by alleging that prison officials had, "with deliberate indifference, exposed [the inmate] to levels of" secondhand tobacco smoke "that pose[d] an unreasonable risk of serious damage to his future health." *Id.* at 35. In reaching that holding, the Court analogized to other fact patterns that it treated as obvious violations of the Eighth Amendment. "[A] prison inmate also could successfully complain about

demonstrably unsafe drinking water without waiting for an attack of dysentery," the Court reasoned. *Id.* at 33. So too would it be an Eighth Amendment violation for "prison officials [to be] deliberately indifferent to the exposure of inmates to a serious, communicable disease." *Id.*[10] *Helling* sent a clear message to prison officials: The Eighth Amendment requires them to reasonably protect inmates from exposure to serious diseases.

Our circuit's precedent reinforces the conclusion that this right was clearly established in the spring of 2020, when the events at issue here occurred. In *Hoptowit v. Spellman*, 753 F.2d 779 (9th Cir. 1985), we held that a "lack of adequate ventilation and air flow undermin[ing] the health of inmates and the sanitation of" a prison violated the Eighth Amendment. *Id.* at 784; *see also Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (citing *Hoptowit* for the principle that "[i]nadequate 'ventilation and air flow' violates the Eighth Amendment if it 'undermines the health of inmates and the sanitation of the penitentiary'"). In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), we held that an inmate stated an Eighth Amendment claim after being assigned prison work that exposed him to asbestos without being provided sufficient protective gear. *Id.* at 1077. And in *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), we held that a prison's failure to "provide prisoners with . . . protection from infectious diseases" (among other

---

[10] *Helling* also cited with approval a Fifth Circuit decision that had recognized an Eighth Amendment violation based in part on the fact that a prison permitted "inmates with serious contagious diseases . . . to mingle with the general prison population." *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974); *see Helling*, 509 U.S. at 34 (citing *Gates*).

deficiencies) was "firmly established in our constitutional law." *Id.* at 664, 676 (citing *Helling*, 509 U.S. at 33).

In light of these cases, all reasonable prison officials would have been on notice in 2020 that they could be held liable for exposing inmates to a serious disease, including a serious communicable disease. Although "COVID-19 may have been unprecedented, . . . the legal theory that Plaintiff[] assert[s] is not." *Polanco*, 76 F.4th at 931.

## C.

Defendants advance two further arguments in support of their position that they are entitled to qualified immunity at this stage of the proceedings, neither of which is persuasive.

## 1.

Defendants first argue that they faced an impossible choice: keep high-risk CIM inmates at a prison experiencing an active COVID-19 outbreak or transfer the inmates out of that prison. Either way, they argue, they would have placed some set of inmates in danger and risked liability for doing so. Defendants contend that it would be inconsistent with the spirit of the qualified immunity doctrine to deny them immunity in a situation in which they had no good options.

Defendants' argument fails because it rests on a premise contrary to the Complaint's allegations. Plaintiff does not challenge Defendants' decision to transfer inmates out of CIM. Rather, Plaintiff challenges decisions that Defendants made in carrying out the transfer that increased the risk to San Quentin inmates without decreasing the risk to the transferred inmates. Those decisions include: (1) transferring inmates to San Quentin, as opposed to a prison with architecture more conducive to quarantining a large group of inmates; (2) transferring inmates without

proper testing or screening; (3) exceeding CDCR's COVID-capacity limits on the buses; and (4) failing to enact post-transfer safety protocols such as mandatory masking.   In other words, as alleged, a good option did exist; the Complaint suggests that, had Defendants tried, they could have moved the CIM inmates without exposing other inmates to an unreasonable risk.  *See Polanco*, 76 F.4th at 929.

## 2.

Defendants next contend that they were just following orders: The court-appointed Receiver's involvement in the decisions surrounding the transfer, they say, absolves them of any responsibility for the transfer's consequences.

For this argument, Defendants rely on the OIG Report.[11] But that Report does not show that the Receiver was responsible for the relevant decisions.  The OIG Report does suggest that the Receiver was involved in some relevant decision-making.  *See* OIG Report at 9 (noting that "[t]he decision to transfer incarcerated persons between prisons was driven by a collaboration between executives from [California Correctional Health Care Services] and from [CDCR]," and thereby implying that the Receiver—who oversees California Correctional Health Care Services—likely played some role); *id. at* 30 (reproducing emails that suggest that prison officials felt pressure from the Receiver to move quickly to protect high-risk CIM inmates).  But the

---

[11] Defendants also point to testimony that the Receiver gave before the California State Senate, which they argue was incorporated into the Complaint by reference.  Because Defendants' assertion of immunity would fail with or without consideration of that testimony, *see Polanco*, 76 F.4th at 931-32, we need not decide whether the testimony was incorporated into the Complaint by reference.

Report does not indicate that the Receiver was involved in—let alone that he directed or approved—the decision to transfer the inmates to San Quentin as opposed to somewhere else.  Nor does the Report suggest that the Receiver was aware of the outdated test results, the decision to house the transferred inmates in open-air cells, or the other post-transfer decisions that allegedly contributed to the outbreak at San Quentin.

In discovery, the parties will have the opportunity to explore the scope of the Receiver's involvement in the transfer.  If discovery reveals that Defendants were complying with orders from the Receiver in all relevant actions underlying Plaintiff's claims, then Defendants may be entitled to qualified immunity.  *See Hines*, 914 F.3d at 1231 (holding that "state officials could have reasonably believed that their actions were constitutional so long as they complied with the orders" from a federal receiver and overseeing court).  But at this early stage in the proceedings, we cannot reach that conclusion.

## V.

Finally, Defendants argue that the district court should have dismissed Plaintiff's state law claims because Defendants are entitled to certain immunities under California law.  Once again, we must first determine whether we can consider this argument immediately under the collateral order doctrine, or whether it must await an appeal from a final judgment.

"For claims of immunity under state law, 'the availability of an [interlocutory] appeal depends on whether, under *state* law, the immunity functions as an immunity from suit or only as a defense to liability.'"  *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (quoting *Liberal*

*v. Estrada*, 632 F.3d 1064, 1074 (9th Cir. 2011)). Although the former may be immediately appealable, the latter is not. *See id.*

Defendants argue that Plaintiff's state law claims are barred by six immunities under California law.[12] Four of the immunities apply to government employees and are codified in the Government Claims Act. *See* Cal. Gov. Code §§ 810-998.3. The other two apply to correctional and emergency-service professionals and are codified in the California Emergency Services Act. *See* Cal. Gov. Code §§ 8550-8669.7. We previously held that one of the immunities in the Government Claims Act, Cal. Gov. Code § 820.2, was an immunity from suit. *See Liberal*, 632 F.3d at 1076.

A recent decision by the California Supreme Court makes us revisit that holding. In *Quigley v. Garden Valley Fire Protection District*, 7 Cal. 5th 798 (2019), the California Supreme Court considered a question similar to the one we now confront: whether an immunity provision in the Government Claims Act "serves as a limitation on the fundamental jurisdiction of the courts" or rather "operates as an affirmative defense to liability." *Id.* at 802-03. To answer that question, the court recounted the history of California immunity doctrine. "At common law," the court explained, "the doctrine of sovereign immunity had two strands: a procedural immunity from suit without the government's consent and a substantive immunity from liability for the conduct of government." *Id.* at 811. The procedural immunity from suit was largely eliminated by the legislature in 1885. *See id.* But, the court explained, the substantive immunity—immunity from *liability*—lived on in the state's common law. *Id.* at 811-12. In the 1960s, California

---

[12] *See* Cal. Gov. Code §§ 820.2, 820.8, 845.2, 855.4, 8658, 8659.

abolished that common law immunity in favor of a statutory approach that eventually became the Government Claims Act. *Id.* at 803, 812. Reasoning from history, the California Supreme Court concluded that the Government Claims Act's immunity provisions were "addressed to questions of substantive liability." *Id.* at 813. The analysis in *Quigley* dictates that the Government Claims Act immunities on which Defendants rely are defenses to liability, not immunities from suit.[13] Our prior holding that section 820.2 is an immunity from suit has thus been "undercut" by "an intervening decision from a state court of last resort . . . 'in such a way that the cases are clearly irreconcilable,'" making that holding effectively overruled by the California Supreme Court. *Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960, 963 (9th Cir. 2020) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)).[14]

---

[13] That conclusion is supported by the statutes themselves, which provide that public employees are not "liable" for some class of injuries. *See* Cal. Gov. Code § 820.2 ("[A] public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him."); § 820.8 ("[A] public employee is not liable for an injury caused by the act or omission of another person."); § 845.2 ("[N]either a public entity nor a public employee is liable for failure to provide a prison, jail or penal or correctional facility . . . sufficient equipment, personnel or facilities."); § 855.4 ("Neither a public entity nor a public employee is liable for an injury resulting from the decision to perform or not to perform any act to promote the public health of the community by preventing disease.").

[14] Both parties note that, prior to its decision in *Quigley*, the California Supreme Court once referred to the immunity conferred by section 820.2 as "immunity from suit." *Caldwell v. Montoya*, 10 Cal. 4th 972, 976 (1996) ("[Section 820.2] generally affords a public employee personal *immunity from suit* when the act or omission for which recovery is sought

The immunities defined in the California Emergency Services Act function the same way as those in the Government Claims Act. Those provisions are also phrased as immunities from liability, just as the Government Claims Act immunities are.[15] It would be odd for California to assign similarly worded immunities different effects, and we see no reason to interpret the statutes as doing so.

Because the state law immunities on which Defendants rely here are immunities from liability, not from suit, Defendants cannot invoke the collateral order doctrine to immediately appeal the district court's rejection of those state law defenses. *See Tuuamalemalo*, 946 F.3d at 476. We thus lack jurisdiction to review that part of Defendants' appeal.

---

resulted from 'the exercise of the discretion vested in him.'" (emphasis added) (quoting Cal. Gov. Code § 820.2)). But *Caldwell* concerned only "a narrow" issue about the scope of section 820.2, not whether the provision serves as an immunity from suit or from liability. *See id.* at 975-76. And elsewhere in the opinion, the court described the immunities in the Government Claims Act as immunities "from liability." *See id.* at 980 ("[The Government Claims Act] establishes the basic rules that public entities are immune from liability except as provided by statute." (emphasis omitted)). We therefore think that *Caldwell*'s passing reference to section 820.2 as an "immunity from suit" was merely imprecise wording in a case where the court had no reason to distinguish between an immunity from suit and a defense to liability.

[15] *Compare* Cal. Gov. Code § 8658 ("Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section."), and § 8659(a) ("Any physician or surgeon . . . who renders services during . . . a state of emergency . . . at the express or implied request of any responsible state or local official or agency shall have no liability for any injury sustained by any person by reason of those services."), *with supra* note 13.

## VI.

For the foregoing reasons, we **AFFIRM in part, REVERSE in part,**[16] **and DISMISS in part.**

---

[16] *See supra* note 1.